374 F.2d 129
 William E. CHANDLER, Jr., Lewie E. Merritt, Jr., Selma G.
Jones, Norwood Capital Corporation, a corporation,
Richland Galleries, a corporation, and
The Pickens Bank, a
corporation, Appellants,
v.
AERO MAYFLOWER TRANSIT COMPANY, Inc., a corporation, Appellee.
 No. 10640.
 United States Court of Appeals Fourth Circuit.
 Argued Dec. 6, 1966.
Decided Feb. 21, 1967.
 
 William E. Chandler, Jr., Greenville, S.C. (William T. Jones and James E. Moore, Greenwood, S.C., on brief), for appellants.
 E. W. Mullins and R. Bruce Shaw, Columbia, S.C. (Claude M. Scarborough, Jr., and Nelson, Mullins, Grier & Scarborough, Columbia, S.C., on brief), for appellee.
 Before BOREMAN, BRYAN and CRAVEN, Circuit Judges.
 CRAVEN, Circuit Judge:
 
 
 1
 This is a suit by William E. Chandler, Jr. (shipper)[1] against Aero Mayflower Transit Company (carrier) to recover the value of household property destroyed by fire while in transit in the carrier's van between Columbia, South Carolina, and San Francisco, California. The principal question for decision is whether the shipper is entitled to recover the fair market value of his property on the basis of the carrier's liability as it existed at common law or whether by reason of the provisions of 49 U.S.C.A. Section 20(11) he is limited in his recovery to the 'released value of the property.'[2]
 
 
 2
 At the close of the evidence offered by the shipper, the carrier moved for a directed verdict that the shipper recover the released value of the property at the rate of thirty cents per pound, amounting here to $1,860.00. The shipper contends that the true value of the property was $31,500.00. From the allowance of the motion for directed verdict[3] the shipper appeals.
 
 
 3
 The rule in the federal courts with respect to the power of the district judge to withdraw a case from the jury is not so narrow as in some state jurisdictions. We do not follow the scintilla rule; 'a scintilla of evidence is not sufficient to require the submission of an issue to a jury' in the federal courts, United States v. J. E. Bohannon Co., 232 F.2d 756 (6th Cir. 1956).
 
 
 4
 But even so, 'in deciding whether a genuine issue of fact exists, the party against whom the motion is made is entitled to the benefit of every inference that may reasonably be drawn in his favor. The court should not supplant the jury if there is any room whatever for disagreement.' Richmond Television Corp. v. United States, 354 F.2d 410, 414 (4th Cir. 1965). The standard for weighing evidence for submission to the jury is subject only to the admonition that 'mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked.' Galloway v. United States, 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458 (1943).
 
 
 5
 From the admissions, stipulations, and evidence offered by the shipper, much of it coming from employees or former employees of the carrier, we think it clear that a jury could permissibly determine the facts to be as related below.
 
 
 6
 On October 23, 1962, employees of the Carolina Bonded and Storage Company, general agent for the carrier, loaded the household property into a van at the shipper's home. The shipper placed his signature on several pages, with multiple carbons, containing an inventory of goods on the van.
 
 
 7
 A bill of lading was not signed by the shipper at his home. According to Larry Shealy, former Carolina Bonded dispatcher and warehouse manager who had handled arrangements for the shipment, this was because the shipper 'was not there to sign it.' However, sometime after the goods had been placed in the moving van and before October 25, the shipper signed the bill of lading, which was dated October 23, 1962.
 
 
 8
 The bill of lading and a company 'order for services,' carrying the date of October 22, 1962, were signed at the request of Shealy in his office after the goods were in transit.[4] The jury could permissibly conclude that the shipper did not examine the documents before signing them because he relied upon Shealy's statement to him that he was only resigning the inventory of goods shipped since his earlier signature had not been effective on the copies. The shipper testified that Shealy asked him to 'sign these inventory papers' and he signed and 'that's the only thing I have ever signed for him.'
 
 
 9
 On November 2, 1962, the shipper's goods were destroyed by fire due to the probable negligence of the carrier.
 
 
 10
 Both the bill of lading and the order for services contained notice to the effect that unless a different value is declared the shipper releases the value at thirty cents per pound for each article, and on neither was a different value declared.[5] The carrier's tariff, which had been filed with and approved by the Interstate Commerce Commission, contained the same terms.
 
 
 11
 Larry Shealy admitted that in discussing the carrier's services with the shipper he misinformed and mislead him into possibly believing that the thirty-cents-a-pound limitation did not apply to recovery for damages or loss of property caused by the fault of negligence of the carrier. /6/
 
 
 12
 It is also admitted that the carrier never issued the bill of lading as required by 49 U.S.C.A. Section 20(11), i.e., it never delivered the original or any copy by mail or otherwise to the shipper until after destruction of his property.[7]
 
 
 13
 The jury could have found from the testimony of the district supervisor of the Interstate Commerce Commission that the carrier, contrary to the requirements of 49 U.S.C.A. Section 6(1), failed to post its tariff for public inspection in Carolina Bonded's office and also that the shipper had not been informed that he could have his household goods transported at a higher valuation for an increase in cast.[8]
 
 
 14
 The carrier admits that in violation of 49 C.F.R. Section 176,12 it failed to give the shipper a copy of an information bulletin which is required by the Interstate Commerce Commission to be furnished prior to the time goods are moved. This bulletin contains an explanation of transportation rates and released values.
 
 
 15
 In short, all of the evidence with special emphasis on the admissions and testimony of persons associated with the carrier, tends to show that the carrier did nothing right and almost everything wrong in connection with the handling of this shipment-- except for getting the signature of the shipper on the order for services and on the bill of lading, which in the latter case admittedly occurred at Carolina Bonded's office after the shipment had begun its journey and under circumstances far from clear.
 
 
 16
 This case does not turn on the legal effect of a bill of lading. Indeed, becuase there was no delivery, there was, strictly speaking, no bill of lading. See, e.g., 13 C.J.S. Carriers 125, at 239 (1939).
 
 
 17
 The resolution of this controversy, rather, is grounded ultimately in federal statutory law and specifically in the terms of 49 U.S.C.A. Section 20(11).[9] Although this section of the Interstate Commerce Act provides that interstate 'carriers shall be liable for the full, actual loss, damage or injury to property delivered to them, a carrier's liability may be limited by agreement upon a 'released value' of a shipment.' Strickland Transp. Co. v. United States, 334 F.2d 172, 175 (5th Cir. 1964). Limitation of liability can be effected by the carrier only when in compliance with an Interstate Commerce Commission 'order authorizing special rates dependent upon either a declaration of value by the shipper in writing or a released value in writing.' Glickfield v. Howard Van Lines, 213 F.2d 723, 725 (9th Cir. 1964). The shipper necessarily may 'agree in writing' only after he has had the opportunity to inspect the written terms. See, e.g., Rhoades, Inc. v. United Air Lines, Inc., 340 F.2d 481, 486 (3d Cir. 1965). 'Although action in writing by the shipper is plainly required, his signature is not necessary but it does furnish good evidence that he did declare or agree in writing.' Caten v. Salt Lake City Movers & Storage Co., 149 F.2d 428, 432 (2d Cir. 1945); accord, American Ry. Express Co. v. Lindenburg, 260 U.S. 584, 43 S.Ct. 206, 67 L.Ed. 414 (1923) (no signature required).
 
 
 18
 No challenge is made to the shipper's authorization by the ICC to carry property at the 'released value.' Thus, the question for us comes to whether the 'released value' in the present circumstances was 'agreed upon in writing' by the shipper in the sense these words are used in 49 U.S.C.A. Section 20(11).
 
 
 19
 Congress no doubt used these words to indicate that a shipper should agree in the same sense that one agrees or assents to enter into a contractual obligation. See, e.g., Rhoads, Inc. v. United Air Lines, Inc.,340 F.2d 481, 486 (3d Cir. 1965). And such assent is effective only if given after 'a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge * * *.' New York, N.H. & H.R.R. v. Nothnagle, 346 U.S. 128, 135, 73 S.Ct. 986, 990, 97 L.Ed. 1500 (1953).[10]
 
 
 20
 In determining whether there was 'agreement' upon a released value courts are, therefore, to apply principles of contract law, and more particularly in the present case the law as it relates to standardized form contracts such as those relied upon by the carrier here.[11]
 
 
 21
 In cases where, as in the instant controversy, questions of mistake and fraud are raised in connection with the formation of contracts limiting the liability of a common carrier, relevant circumstances and policies call for a not so strict application of pertinent principles of contract law to afford reasonable protection to the shipper. This is so because arrangements limiting liability contravene a strong public policy expressed in the common law[12] come within a carefully defined exception to the general thrust of Section 20(11) of the Interstate Commerce Act placing on the carrier absolute liability for damage,[13] and are in operation attended by characteristics of an adhesion contract.[14] We will, therefore, examine the law of contracts from the stated orientation to determine whether the shipper on the facts in the present case is precluded as a matter of law from attacking the validity of the agreements manifested on the face of the bill of lading and order for services admittedly bearing his signature.
 
 
 22
 Ordinarily, one who signs a contract cannot avoid it on the ground that he did not read it or that he took someone else's word as to what it contained. See, e.g., Maryland Cas. Co. v. Morris Oil Corp., 233 F.2d 291, 293 (4th Cir. 1956); Cox v. Pabst Brewing Co., 128 F.2d 468, 471 (10th Cir. 1942); see 17 Am.Jur.2d Contracts 149, at 497 (1964); 17 C.J.S. Contracts 137, at 871-875 (1963). But an agreement signed without negligence under the belief that it is an instrument of a different character is void, and the failure to read an instrument is not negligence per se but must be considered in light of all surrounding facts and circumstances. See, e.g., Borden v. Day, 197 Okl. 110, 111-112, 168 P.2d 646, 648 (1946); see Simpson, Contracts 42, at 64 (2d ed. 1965); 1 Williston, Contracts 95A, at 351-352 (3d ed. 1957); 17 Am.Jur.2d Contracts 149, at 499 (1964); 17 C.J.S. Contracts 137, at 880 (1963); 8 Halsbury's Laws of England Contract 2, at 82 (3d ed. 1954).
 
 
 23
 In his treatise on the law of contracts, Professor Williston states that
 
 
 24
 'Such a mistake as to the character of the instrument may relate to its existence as a contract or legally operative document of any kind, or to whether it is the kind of contract or legal document which it purports to be. * * * Negligence is (in the former case) * * * much less of a factor, since the average reasonable man would not be expected to exercise that caution which he would if he knew that he was signing what purported to be a legal document; particularly if he intended to become a party thereto. In the latter type of case, such a mistake without negligence will not often occur in the absence of some such fraud, as substituting by sleight-of-hand, for a paper which has been agreed upon, a different one. Nevertheless, the situation is possible without actual fraud, and if it occurs whether induced by fraud, or without it, no contract is formed.' 1 Williston, Contracts 95A, at 351-52 (3d ed. 1957).
 
 
 25
 If one's signature is obtained by trick or artifice, unquestionably the alleged contract may be invalidated. See, e.g., Dodson v. Abercrombie,212 Ark. 918, 922-923, 208 S.W.2d 433, 435 (1948); Johnson v. Allen, 108 Utah 148, 152-154, 158 P.2d 134, 137, 159 A.L.R. 256 (1945); see 3 Corbin, Contracts 607, at 666-68 (1960); 17 Am.Jur.2d Contracts 152, at 503 (1964); 17 C.J.S. Contracts 138, at 880 (1963).
 
 
 26
 Although the question is not free from doubt, we think that all the evidence-- reviewed in cursory fashion above-- is sufficient to present issues of fact for the jury and that the district judge lacked the power to direct a verdict for the amount of limited liability admitted by the carrier. Since there must be a new trial, we suggest on remand that issues be framed for consideration by the jury (in such form as the district judge may think appropriate) to determine:
 
 
 27
 (a) whether the shipper knew at the time he signed the papers (both the bill of lading and the order for services) that they were, in fact, contractual documents rather than additional copies of inventory sheets; and
 
 
 28
 (b) if he was under a belief that they were inventory sheets, was his failure to read them and ascertain their true nature excusable under all of the circumstances, i.e., in signing without reading the documents did the shipper act as a person of ordinary prudence would have acted in the circumstances.[15]
 
 
 29
 Only if both these issues are answered in favor of the shipper can he be relieved of the effect of his signature.
 
 
 30
 Even if he is so relieved, it does not necessarily follow that he is entitled to recover the full value of his lost property. It is still possible that the jury might determine that there was an agreement in writing as to released value-- without regard to the invalidity of the shipper's signature.[16]
 
 
 31
 Finally, we think the district court ought to consider whether the pleadings should be amended, if necessary, and the shipper afforded opportunity to litigate an alternative and entirely different theory of liability. Regardless of whether there may have been an agreement in writing, signed or otherwise, we think it would be unavailing to limit liability unless the shipper had been given reasonable notice by the carrier that he actually had a choice of 'higher or lower liability by paying a correspondingly greater or lesser charge.' New York, N.H. & H.R.R. v. Nothnagle, 346 U.S. 128, 135, 73 S.Ct. 986, 990 (1953). Reasonable notice is necessary to provide the shipper with a genuine 'opportunity to choose between higher and lower rates based upon valuation * * *.' Caten v. Salt Lake City Movers & Storage Co., 149 F.2d 428, 432 (2d Cir. 1945). The Supreme Court of Washington has stated the applicable law to be that 'any limitation of liability must be brought to the attention of the shipper, and a choice given to the shipper to contract with, or without, the limitation of liability in the movement of his goods.' Holmes v. National Van Lines, Inc., 55 Wash.2d 861, 862, 350 P.2d 864, 866.
 
 
 32
 Since this alternative ground of recovery was not fully litigated below, nor briefed on appeal, we express no opinion as to whether the shipper, on the facts of this case, would be entitled to recover on such a theory.[17]
 
 
 33
 We affirm the district court's decision that the plaintiff shipper is not entitled in this action to recover from the carrier punitive damages. See 49 U.S.C.A. 20(11); Gulf, C. & S.F. Ry. v. Texas Packing Co., 244 U.S. 31, 37 S.Ct. 487, 61 L.Ed. 970 (1917); W. A. Stackpole Motor Transp. Inc. v. Malden Spinning & Dyeing Co., 263 F.2d 47, 50-52 (1st Cir. 1958); Missouri Pac. R. Co. v. H. Rouw Co., 258 F.2d 445 (5th Cir. 1958); Inninois C.R.R. v. Zucchero, 221 F.2d 934, 937-938 (8th Cir. 1955).
 
 
 34
 Since there is to be another trial, it is unnecessary that we consider the remaining assignments of error.
 
 
 35
 Affirmed in part, reversed in part and remanded for a new trial.
 
 
 
 [1]
 The other plaintiffs were joined on motion of the defendant because they are creditors of Chandler, and apparently they have no other interest in the controversy
 
 
 [2]
 The Carmack Amendment to the Interstate Commerce Act, as amended 49 U.S.C.A. 20(11), 'codified the common-law rule that a carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage was caused by '(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods'.' Missouri Pac. R.R. v. Elmore & Stahl, 377 U.S. 134, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964); accord, Secretary of Agriculture v. United States, 350 U.S. 162, 165 n. 9, 76 S.Ct. 244, 100 L.Ed. 173 (1956). The statute makes interstate common carriers liable 'for the full actual loss, damage, or injury to * * * property caused by (them) * * * notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission * * *.' 49 U.S.C.A. 20(11). However, an exemption from this strict rule exists for property for which carriers are 'expressly authorized' by order of the ICC to 'maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall * * * limit liability and recovery to an amount not exceeding the value so declared or released * * *.' Ibid. 49 U.S.C.A. Section 319 provides expressly that the terms of 49 U.S.C.A. 20(11) shall apply 'with respect to common carriers by motor vehicle * * *.'
 
 
 [3]
 Unnecessarily, but harmlessly, the district judge directed the foreman of the jury to sign the verdict and recorded the assent of the jurors as they sat in the box. Since 1963, Rule 50 of the Federal Rules of Civil Procedure has contained the following: 'The order of the court granting a motion for a directed verdict is effective without any assent of the jury.'
 
 
 [4]
 It was agreed that the bill of lading was not signed until after shipment of the goods. Whether the order for services was signed prior or subsequent to shipment was sharply disputed
 
 
 [5]
 The declared value on the bill of lading was shown in a blank provided at '.30' a pound. The declared value on the order for services was omitted and the blank space struck through-- itself a bit ambiguous
 Both the bill of lading and order for services were standardized printed forms with blanks on their faces to be completed by the contracting parties. On the back of each was printed the very technical detailed contract terms and conditions governing shipment of household goods. Nowhere is the shipper affirmatively told that for a moderate price increase he can buy greater protection.
 
 
 [6]
 The record contains Larry Shealy's statement that in dealing with the shipper 'I told him that he would automatically be paid for * * * breakage damage out of the $1,800.00 standing to his credit without his having to do anything about proving the company was at fault or negligent in causing the breakage * * *. I possibly realized that this caused him to believe that he was fully protected by us from any other kind of loss. As I told (him) * * * at the time, he is not limited to .30 per pound value on damages to his household goods. This is merely what he receives without having to do anything. * * * If you can't prove the company was at fault or negligent the .30 per pound is all that you can receive no matter how much your total loss comes to. This is the way that it is and the way I explained it to (the shipper) * * * at the time I talked to him about it.'
 
 
 [7]
 49 U.S.C.A. Section 20(11) requires that a common carrier receiving goods 'shall issue a receipt or bill of lading therefor * * *.'
 
 
 [8]
 The district supervisor testified that on visiting Carolina Bonded on November 28, 1962, he was informed that there was no copy of the carrier's tariff in its office. He testified further that he had inquired of Larry Shealy 'if he had informed Mr. Chandler (shipper) that he could have his household goods transported at a higher cost on a higher valuation. He (Shealy) said he had not.'
 
 
 [9]
 See note 2 supra for a discussion of pertinent provisions of 49 U.S.C.A. 20(11)
 
 
 [10]
 'The statute makes it abundantly clear that the carrier's common law liability for full actual damages, whether or not caused by its negligence, is imposed when it accepts goods for carriage, unless a certain specified agreement limiting that liability has been made as the result of an equally certain specified action by the shipper in respect to a voluntary valuation of his goods. * * * Only by giving the shipper an opportunity to choose between higher and lower rates based upon valuation can the carrier place the shipper who has selected a lower rate in the prescribed manner in the position where he is estopped to assert loss or damage to an amount in excess of the declared valuation upon which the rate was fixed.' Caten v. Salt Lake City Movers & Storage Co., 149 F.2d 428, 432 (2d Cir. 1945)
 
 
 [11]
 That there is a difference between contracts negotiated between coequals and standard printed form contracts offered the public by industries so powerful, by reason of franchise or otherwise, to effectively impose terms (called an 'adhesion contract') was eloquently urged more than twenty years ago:
 'apparently the realization of the deep-going antinomies in the structure of our system of contracts is too painful an experience to be permitted to rise to the full level of consciousness. Consequently, courts have made great efforts to protect the weaker contracting party and still keep 'the elementary rules' of the law of contracts intact. As a result, our common law of standardized contracts is highly contradictory and confusing * * *.' Kessler, Contracts of Adhesion-- Some Thoughts About Freedom of Contract, 43 Colum.L.Rev. 629, 633 (1943).
 As Mr. Justice Clark said in Nothnagle, 'it is recognized that the carrier and the individual customer are not on an equal footing.' New York, N.H. & H.R.R. v. Nothnagle, 346 U.S. 128, 136, 73 S.Ct. 986, 990 (1953).
 
 
 [12]
 See note 2 supra; Dobie, Bailments and Carriers 116 (1914); 14 Am.Jur.2d Carriers 508-09 (1964); 13 C.J.S. Carriers 71 (1939)
 
 
 [13]
 See 49 U.S.C.A. 20(11). The general rule is that any limitation on the liability of an interstate common carrier for property being transported 'without respect to the manner or form in which it is sought to be made is * * * unlawful and void.' 49 U.S.C.A. 20(11)
 
 
 [14]
 What is meant by an 'adhesion contract' is indicated in note 11 supra. See generally Meyer, Contracts of Adhesion and the Doctrine of Fundamental Breach, 50 Va.L.Rev. 1178 (1964); Patterson, The Interpretation and Construction of Contracts, 64 Colum.L.Rev. 833, 855-62 (1964); Lenhoff, Contracts of Adhesion and the Freedom of Contract; A Comparative Study in Light of American and Foreign Law, 36 Tul.L.Rev. 481 (1962); Kessler, Contracts of Adhesion-- Some Thought About Freedom to Contract, 43 Colum.L.Rev. 629 (1943); Llewellyn, Book Review, 52 Harv.L.Rev. 700 (1939)
 
 
 [15]
 See Davis v. Davis, 256 N.C. 468, 124 S.E.2d 130 (1962), for approval of a similar issue with respect to execution of a release
 
 
 [16]
 We express no opinion on whether the evidence presented at the second trial will support the submission of this question as a separate issue for the jury. The facts may develop again in such a way that the issues merge, i.e., that the only possible agreements in writing are the signed ones and that the validity of such agreements turns solely on the factual issues determinative of the fact of signature
 
 
 [17]
 Compare Cray v. Pennsylvania Greyhound Lines, Inc. in which it was held that where a motor carrier has filed tariff regulations with the ICC which include a provision limiting liability 'for loss of free baggage to $25, unless a higher valuation is declared and paid for, has referred to such tariff regulations on its transportation tickets and baggage checks, and has posted prominent notices of the limitation of its liability in conspicuous locations on the windows of its ticket and baggage checking windows, * * * such carrier has provided a fair opportunity for passengers to choose between higher or lower liability by paying a correspondingly greater or lesser charge; and the limitation of liability contained in its published tariff regulations cannot be waived by the statement of a baggage agent to a passenger that it is not necessary to insure her baggage * * *.' 177 Pa.Super. 275, 283, 110 A.2d 892, 896 (1955)