William B. ROBINSON,
Plaintiff-Appellee,

v.

RALPH G. SMITH, INCORPORATED,
Defendant-Appellant.

No. 83–5045.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 14, 1984.

Decided May 22, 1984.

Rehearing Denied June 22, 1984.

William J. Gallion (Lead), argued, Fowler, Measle & Bell, Stephen P. Carson, Lexington, Ky., for defendant-appellant.

Joseph R. Arnold (Lead), argued, Lexington, Ky., Pat Douglas Davis, Elizabeth

Blackford, Versailles, Ky., for plaintiff-appellee.

Before MERRITT and WELLFORD, Circuit Judges and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

This is an appeal from a judgment entered on a jury verdict granting plaintiff-appellee, William B. Robinson (Robinson), damages in the amount of $75,000 for injuries to his horse while it was being transported by defendant-appellant, Ralph G. Smith, Inc. (Smith), a carrier licensed under the Interstate Commerce Act. Smith's chief contention on appeal is that the district court erred in ruling as a matter of law that Smith's liability to Robinson was not effectively limited by a limitation provision in the bill of lading issued by Smith, it being Smith's contention that under 49 U.S.C. § 10730 (1980) its liability was so limited. Smith further contends that the district court, after ruling that the rights of the parties were not controlled by the terms of the bill of lading, also made errors of law (applying Kentucky law)[1] in its instructions to the jury and in failing to rule that Smith was entitled to prevail as a matter of law.

We determine that the district court erred in ruling that, as a matter of law, the bill of lading did not effectively limit Smith's liability because, we believe, a jury issue was created in that respect. We further conclude that, assuming Kentucky law does control the rights of the parties, the district court did not err in its instructions to the jury. Accordingly, we vacate the judgment and remand for further proceedings consistent with this opinion.

Robinson is engaged in the business of horse training, breeding and racing, and operates horse farms in Kentucky and South Carolina. During the summer of 1980, Robinson wished to have one of his racehorses, Pro-Rate, moved from Delaware Park, Delaware, to his farm in Kentucky and to have another of his racehorses, Run Kentucky Run, moved from his farm in Kentucky to Delaware Park. At some point prior to the August 12 shipping date, Robinson contacted R.G. Sallee, an agent of Smith, in regard to transporting the two horses. Details of the transfer were not discussed; there was no mention of the fee to be paid, the value of the horses, or who would have authority to ship them. The arrangement was to ship the horses at "carrier's convenience," whereby the carrier arranges at its convenience to transport the horse, usually with other horses owned by other individuals travelling to different locations.

Shortly before August 12, Robinson informed Rick Hiles, his trainer at Delaware Park, that Pro-Rate was to be picked up by Smith's van. Herb Maughan, Smith's agent, then went to Robinson's stables at Delaware Park and informed Hiles of the pending transport; Hiles told him that he already knew about it. Maughan testified that while at Robinson's stables, he saw Ray Barton, a groom employed by Robinson, who subsequently signed the bill of lading for Pro-Rate.

On the morning of the 12th, Maughan returned to Robinson's stables at Delaware Park and, he testified, told Hiles that Smith's van would be there to pick up Pro-Rate around noon. Maughan further testified that while he was at the stables he saw Ray Barton working there.

At approximately 11:00 a.m. on the 12th, Hiles left the stables and went home. Shortly after noon, Smith's van, with two drivers and Ralph Giles, an attendant, arrived at Delaware Park. Maughan testified that he then notified Barton that the van was there for Pro-Rate, and that Barton indicated that he had known that the van was scheduled to arrive. Barton then led Pro-Rate out to the van and, as in-

---

1. Both parties appear to have agreed below and agree here that if the rights of the parties are not controlled by the terms of the bill of lading, these rights must be determined under Kentucky law. We accept this assumption, including the proposition that, under Kentucky conflict of laws, Kentucky law governs.

structed, backed Pro-Rate, a two-year-old uncastrated horse, into a stall next to a seven-year-old uncastrated horse named Glorieuse that had been picked up earlier.

After the horse was loaded, Maughan handed Barton a "Uniform Live Stock Bill of Lading" for Pro-Rate's shipment. Maughan had already filled in the bill of lading, except for the shipper's signature, including the declared value of $200.00 for Pro-Rate at the basic rate charge. Barton signed the bill of lading and accepted a copy.

On the same day in Kentucky, Robinson personally signed a bill of lading in the same form for the shipment of Run Kentucky Run by the defendant. This bill of lading also included the $200.00 declared value provision for shipment at the basic rate charge. The district court sustained Robinson's objection to this evidence.

After Pro-Rate was loaded, Smith's van left Delaware Park. Some thirty miles from Delaware Park, Glorieuse broke free from his restraints and began to attack, or, in the language of the business, savage, Pro-Rate. The attendant, Giles, who was riding in the back with the horses, signalled the driver, who pulled over. The men attempted to separate the horses, but were unable to do so until a veterinarian was called to tranquilize Glorieuse. Smith's van then returned Pro-Rate to Delaware Park.

At the trial in the district court, it was Robinson's contention in general that his horse, Pro-Rate, was injured because Smith's agents negligently placed the two uncastrated horses side by side and negligently secured the horses in the van. As stated, the district court determined as a matter of law that the bill of lading did not place a cap on Smith's liability to Robinson, and it submitted the case to the jury as a negligence case under Kentucky law, resulting in a $75,000 verdict and judgment in favor of Robinson.

The district court ruled that the limitation in the bill of lading was legally ineffective for three reasons: (1) the bill of lading issued by Smith, did not, by its terms,

strictly comply with the requirements of Smith's tariff on file with the Interstate Commerce Commission; (2) Robinson did not have a fair opportunity to select a higher shipping charge with a higher declared value for Pro-Rate; and (3) in any event, there was no evidence that the person who received the bill of lading had authority, apparent or otherwise, to do so.

The parties properly agree that, pursuant to 49 U.S.C. § 10730 (1980), a common carrier may limit its liability to a shipper by filing a tariff with the Commission so providing and by issuing a bill of lading so providing to the shipper. Robinson contended, and the district court agreed, that the terms of the bill of lading limiting liability did not strictly comply with the tariff and that unless the terms of the bill of lading strictly comply, the bill of lading is ineffective in limiting liability. Smith agrees that there was not strict compliance here but contends that there was substantial compliance and that substantial compliance is sufficient.

Under the tariff, an animal shipped under the basic rate would have a declared value of $200 and a higher declared value would involve a higher transportation charge. The tariff (Rule 19(b)) also required that bills of lading contain the following language:

> The agreed or declared value of the property is hereby specifically stated to be not exceeding $_____ per animal.

The bill of lading as issued contained the following words, all in capital letters:

> SHIPPERS ARE REQUIRED TO DECLARE IN WRITING THE AGREED OR RELEASED VALUATION OF EACH ANIMAL.

Immediately below on the bill of lading were spaces to fill in, *inter alia*, the name of the horse to be shipped and its declared value. In these spaces were filled in Pro-Rate's name and the declared value at $200.

The district court, in being persuaded by Robinson that the terms of the bill of lading must strictly comply with the require-

ments of the tariff, mainly relied on *Caspe v. Aaacon Auto Transport, Inc.*, 658 F.2d 613 (8th Cir.1981). We do not, however, read *Caspe* as requiring strict compliance. There the plaintiffs entered into a contract with the defendant carrier to transport their automobile. The plaintiffs signed a bill of lading containing language which purported to limit the defendant's liability for all personal property in the automobile to $50.00, and providing that in no event should the designated value of personal property exceed $250.00. An employee of the defendant stole the car and several thousand dollars worth of plaintiffs' personal property that was in the car. The district court found that the $50.00 limitation clause was legally ineffective for failure to comply with the applicable tariff. The court of appeals affirmed this holding, but specifically noted that, contrary to the requirement of the tariff, the limitation clause was buried in the bill of lading and that there was no space for the shipper to declare the value of the property to be shipped. This opinion in *Caspe* is hardly authority for the proposition that the bill of lading must strictly comply with the requirement of the tariff.

Several cases have at least strongly suggested that a substantial compliance with an ICC tariff is enough to limit a carrier's liability. *American Railway Express Co. v. Lindenburg*, 260 U.S. 584, 43 S.Ct. 206, 67 L.Ed. 414 (1923); *Strickland Transportation Co. v. United States*, 334 F.2d 172 (5th Cir.1964); *Glickfeld v. Howard Van Lines*, 213 F.2d 723 (9th Cir.1954).

■ The legislative history of the 1980 amendments to the statute sheds some light on this question. As set out in the history, the purpose behind allowing carriers to set low declared value shipping rates is to encourage competition by allowing shippers to choose for themselves the amount of "insurance" they wish to cover a shipped article. If the declared value of the shipped goods is low, the risk to the carrier is low and the rate to the shipper is consequently lower. The shipper may thus decide for himself whether to accept a low declared value and pay a lower shipping rate accordingly and to accept the risk of loss or procure insurance elsewhere. This practice is aimed at encouraging price flexibility and reducing unnecessary federal regulation. H.R.Rep. No. 96–1069, 96th Cong.2d Sess., 25–26, *reprinted in* 1980 *U.S.Code Cong. & Ad.News* 2283, 2307–08.

■ We believe that the policy that induced this legislation will best be served by the adoption of a substantial compliance rule. This rule will encourage interstate carriers to establish variable rates in ICC tariffs without fear of heavy liability if they fail to strictly comply with the directions of their tariffs. At the same time, this rule will adequately protect shippers by requiring that their shipping options are clearly spelled out in the bill of lading. The carrier will bear the burden of showing that a bill of lading is in substantial compliance.

■ Having adopted a substantial compliance test, we must now decide whether Smith's bill of lading meets this test. The language in the limitation clauses of both the tariff and the bill of lading is similar and conveys the same meaning. Furthermore, the limitation clause of the bill of lading is eyecatching in that it is set out in a separate paragraph and all in capital letters, enhancing the probability that it will be seen by the shipper, and ample space is provided for the shipper to write his own estimate of the value of the animal to be shipped. *Compare Caspe v. Aaacon Auto Transport, Inc.*, 658 F.2d 613. We find, therefore, that Smith has met the burden of showing that its bill of lading was in substantial compliance with the requirements of its ICC tariff.

■ The district court also determined that the liability limitation in the bill of lading was not effective because Robinson did not have a fair opportunity to choose a higher shipping charge with a higher declared value for Pro-Rate. In this respect, the district court relied in part on *Lux Art Van Service, Inc. v. Pollard*, 344 F.2d 883 (9th Cir.), *cert. denied*, 382 U.S. 837, 86

S.Ct. 85, 15 L.Ed.2d 80 (1965). In *Lux,* an owner of brood mares had, as was his practice, sent a mare to another farm for breeding. It was the custom of the operator of the breeding farm and the owner of the mares for the operator to advise the owner when a mare was ready to be returned. The owner would then send for the mare with his own vehicle. In this instance the operator of the breeding farm unaccountably shipped the mare on his own initiative by the defendant carrier. The mare died in transit. The court determined that the carrier's liability was not limited by a limitation provision in the bill of lading because the mare's owner had no opportunity to choose the rate and the declared value. But the basis of this decision was the proposition that the operator of the breeding farm, in shipping under the bill of lading with such limitation of liability, was not the agent of the owner in that the operator had neither actual nor apparent authority to make the shipment for the owner. In the instant case, on the contrary, as we determine herein, it was a jury issue whether Robinson was bound by the action of his groom, Barton, in shipping the horse under this bill of lading. The district court also apparently relied in part on *New York, N.H. & H.R. Co. v. Nothnagle,* 346 U.S. 128, 73 S.Ct. 986, 97 L.Ed. 1500 (1953) and *Anton v. Greyhound Van Lines, Inc.,* 591 F.2d 103 (1st Cir.1978), but in neither of these cases did the shipper or the shipper's representative make the shipment under a bill of lading that limited liability.

■ We should also state at this point that evidence of Robinson's having personally shipped on the same day another horse, Run Kentucky Run, with the same declared value limitation, on the same form of bill of lading was admissible as evidence that Robinson had actual knowledge and approved of Smith's practice of transporting horses at a declared value of $200 unless a higher value with a higher shipping charge was requested.

■ We therefore conclude that the district court erred in determining as a matter of law that Robinson did not have a fair opportunity to choose a higher declared value and shipping rate, for if Barton did have authority, apparent or otherwise, to release Pro-Rate under this bill of lading, then Robinson did have a fair opportunity. *American Express Co. v. Lindenburg,* 260 U.S. 584, 43 S.Ct. 206, 67 L.Ed. 414.

■ As stated, the district court concluded that, as a matter of law, the person who signed had no authority, apparent or otherwise, to release Pro-Rate under the terms of the bill of lading. In so deciding, the district court appeared to rule that there was no evidence that the person who signed the bill of lading "Ray Barton" was in fact the Barton who was working at the stables as a groom at that time. Actually, at trial, Robinson did not even contend that the person who signed as "Ray Barton" was an imposter; his contention simply was that Barton had no authority. Suffice it to say, in any event, that the record is more than sufficient to support the contention that the person who signed was the Ray Barton that Smith's employee, Maughan, saw working at the stable as a groom before Pro-Rate was picked up.

While the burden was upon Smith to show that Barton acted with authority, it appears to us that there was ample evidence from which a jury could within reason find that Barton had apparent authority. After all, the proof was that the release of Pro-Rate under a bill of lading containing these terms was a routine transaction of the type that an employee in Barton's position could carry out.[2]

Thus we conclude that the district court erred in not submitting to the jury, under proper instructions, the question whether Barton's release of Pro-Rate under the bill of lading was binding as to Robinson.

---

**2.** Indeed, it appears to us that, if we also consider the evidence that Robinson had that day approved a shipment of Run Kentucky Run on the same terms, a jury could find that Barton had implied authority. We do not understand Robinson to contend that the shipment of the two horses would call for different terms of shipment.

Smith also relies on a provision in his tariff (Rule 18(c)) that provides that:

Shipments upon which the Shipper declares a value in excess of Ten Thousand Dollars will not be accepted.

Smith argues, alternatively, that this provision would limit its liability to $10,000. Assuming *arguendo*, that such provision would have that effect if applicable, it appears that Smith's liability would not in any event be limited by the tariff unless Barton acted with authority when he released Pro-Rate under the bill of lading, and if he did act with authority, Smith's liability is limited to $200. Thus Smith's reliance on the $10,000 limitation adds nothing to its defenses.

Assuming, now, that the limitation of liability in the bill of lading was ineffective, Smith contends that the district court was in error under Kentucky law in not holding, as a matter of law, that Robinson's claim was barred by the contributory negligence of the attendant, Ralph Giles. Smith's contention is based on a requirement in the tariff that the shipper supply an attendant, which, Smith contends, made Giles the agent of Robinson. Therefore, Smith argues, Giles' negligence was imputable to Robinson. The short answer to this contention is that the tariff provision does not purport to make Giles, who was generally Smith's employee, an agent of the shipper; the tariff, as stated, only requires the shipper to supply an attendant or attendants, which Robinson, of course, did not do. It should be noted that the owner of Glorieuse had not supplied an attendant. Apparently this requirement of the tariff, if applicable, was waived. In any event, we conclude that the district court committed no error in not treating Giles' negligence as imputable to Robinson.

Smith also contends that the district court erred in giving specific and detailed instructions on negligence since, Smith contends, the required state practice is that the trial judge give only bare-bone instructions. We do not, however, consider this Kentucky practice to be binding on the federal district court.

Smith further contends that the district court erred in that interrogatory 1(c) submitted to the jury in effect imposed on it a higher degree of care than reasonable and ordinary care. We do not agree. This interrogatory simply presented the question whether Smith failed to place Pro-Rate in the safest available position in the van and, if so, whether such failure constituted a failure to exercise ordinary care. As a common carrier, Smith at the least owed the duty to exercise ordinary care.[3]

We have carefully considered Smith's other claims of error and find them to be without merit.

The judgment of the district court is vacated and the cause is remanded for further proceedings consistent with this opinion.

---

**3.** As to the standard of care applicable to common carriers under Kentucky law, compare *Southern Express Co. v. Fox & Logan*, 131 Ky. 257, 115 S.W. 184 (1909) and *Senters v. Ratliff's Adm'r.*, 278 Ky. 290, 128 S.W.2d 724 (1939).