**Kenneth A. JACKSON d/b/a Kentuckiana Racing Stable, Plaintiff,**

v.

**BROOK LEDGE, INC., Defendant.**

No. Civ.A. 96–384.

United States District Court,
E.D. Kentucky.

Dec. 17, 1997.

Phillip D. Scott, Margaret A. Miller, David A. French, Greenebaum, Doll & McDonald, P.L.L.C., Lexington, KY, for Kenneth A. Jackson dba Kentuckiana Racing Stable, plaintiff.

Timothy H. Napier, Weber & Rose, P.S.C., Louisville, KY, Robert D. Kinsey, Jr., Richard L. Rice, Kinsey, Ridenour, Becker & Kistler, Lincoln, NE, for Brook Ledge, Inc., defendant.

**OPINION AND ORDER**

FORESTER, District Judge.

## I. INTRODUCTION

This matter is before the court upon the motion of defendant for summary judgment [docket entry # 37]. The plaintiff filed a response in opposition to said motion [docket entry # 50], to which defendant has replied [docket entry # 53]. Accordingly, this matter is ripe for review.

## II. FACTUAL BACKGROUND

This action arises from the transportation of a standardbred filly named "Dream Fulfilled," which resulted in the horse's demise.[1] The events which lead up to the death of the filly are as follows.

Plaintiff, Kenneth A. Jackson d/b/a Kentuckiana Racing Stable ("Jackson"), at all relevant times to this litigation, was the owner of Dream Fulfilled. Germane to this litigation is the fact that Jackson is a practicing attorney as well as a horseman. He has been a member of the U.S. Trotting Association since 1988. In 1993, Jackson became a 50% shareholder in an S corporation that acquired one-third of the shares of Kentuckiana Farms General Partnership ("Kentuckiana Farms"), a newly formed entity that bought the assets of former Kentuckiana Farms. Thereafter, he became a member of the management team of Kentuckiana Farms. In 1995, Jackson formed Kentuckiana Racing Stables, a business of racing standardbred and thoroughbred horses of which he is the sole owner. Through these two entities, Jackson owns approximately 100 horses. As a lawyer, he has specialized training and knowledge in the area of commercial litigation and equine law as well as being educated in the Uniform Commercial Code and contracts. Despite his intertwined experience with the law and horses, Jackson attests that before November 1995, he had never been involved with arranging horse transportation by a commercial company and had never seen a bill of lading from a horse shipping company or a trucking company.[2]

---

1. The trotter earned over $60,000 in racing purses during her two-year old season in 1995, the season preceding her passing.

2. Apparently, Jackson had previously transported his horses in private trailers owned by Jackson himself, his farm(s)/stable(s), and/or his respective trainers.

Moreover, he submits that he had never heard of the Carmack Amendment of the Interstate Commerce Act ("Carmack Amendment").

Beginning in October 1994, Jackson employed Gene Daisey ("Daisey") as the trainer of Dream Fulfilled.[3] Daisey has been a trainer since 1955. For the past fifteen (15) years Daisey has been the owner of Daisey Stables at the South Florida Trotting Center located near Palm Beach, Florida. Pertinent to this action is the fact that Daisey has shipped horses both commercially and personally, signed bills of lading, and has used Brook Ledge as many as 100 times to commercially ship horses. Nevertheless, Daisey submits that previously he "[n]ever read the thing[s]," and never had any discussion about the liability limitation therein. With respect to the transportation of Dream Fulfilled prior to November 1995, it appears that Daisey used his own horse transportation trailers or those of Kentuckiana Farms.

Daisey brought Dream Fulfilled to the Florida training center. While in Florida, Daisey, in his capacity as trainer, employed Roderick Watson ("Watson") to assist in the care of Dream Fulfilled as the standard-bred's groom. Watson has been employed in the horse industry since 1981.

In early November, 1995, Daisey contacted a Brook Ledge, Inc. ("Brook Ledge") agent to arrange for the transportation of Dream Fulfilled from Palm Beach, Florida, to Lexington, Kentucky, for a routine rest period. The transfer was to occur on or about November 8, 1995. Jackson was not involved in arranging the transfer of Dream Fulfilled.

Brook Ledge was at the time, and currently is, an interstate motor carrier in the business of transporting horses in interstate commerce, and transports approximately 20,000 horses annually. Antecedent to the date of the fatal accident, Brook Ledge had transported horses for Kentuckiana Farms General Partnership on occasion and consequently bills of lading had previously been executed by the shipper or the shipper's agent. All of these said bills of lading contained a limitation of liability provision and a line on which the shipper could declare a value in excess of the stated value.[4]

On November 8, 1995, Brook Ledge dispatched Anthony Mariano ("Mariano") with tractor No. 79 and trailer No. 266, to pick up Dream Fulfilled. Mariano arrived at the South Florida Trotting Center as scheduled. Upon hearing the Brook Ledge truck arrive, Watson retrieved Brook Ledge to meet Mariano. Watson assisted Mariano in loading Dream Fulfilled into the trailer. Mariano filled out the bill of lading and presented the same to Watson, who Mariano thought was the trainer.[5] He instructed Watson to sign where the "X" was. Watson signed the bill of lading as the shipper but did not insert an excess declared value in the column on the bill of lading entitled "Declared Value of Each Animal ($1,000) (unless declared otherwise)".[6] Watson submits that he has never read a bill of lading, although he has signed them before. Watson attests that he simply followed Mariano's instructions to sign the document. He states that there was no discussion regarding the bill of lading.

On November 9, 1995, with Dream Fulfilled in tow, Mariano, a relief driver, and an attendant traveled from South Florida to Ocala, Florida, where other horses were

---

3. Daisey did not acquire an ownership interest in Dream Fulfilled.

4. As customary in the industry, Brook Ledge maintains transportation rates for shipments in which no excess declared value is indicated on the bill of lading. When a shipper declares an excess value the charge to transport the shipment increases.

5. Mariano states that he was in the practice of having a trainer or owner sign the bill of lading.

6. The bill of lading stated in red bold print:

**THE AGREED OR DECLARED VALUE OF THE PROPERTY IS HEREBY SPECIFICALLY STATED BY THE SHIPPER OR SHIPPER'S AGENT TO BE NOT EXCEEDING $1,000 PER ANIMAL UNLESS SPECIFIED OTHERWISE HEREIN.**
Shipper is encouraged to obtain its own insurance for any amount greater than the $1,000 declared value, it being acknowledged and understood by all parties hereto that animals transported may have an actual value in excess of the declared value ... *If no valuation is declared in writing herein, the maximum liability is $1,000 per animal.*

loaded into the trailer. The group proceeded on to Kentucky, where in Rockcastle County, Kentucky, the trailer in which the horses were riding caught fire. The relief driver, Jim Kerrigan ("Kerrigan"), stopped when he saw sparks coming out of the trailer.[7]

There were two fire extinguishers on board. Kerrigan emptied the fire extinguisher which was in the tractor, but no one could reach the fire extinguisher in the trailer due to the flames which engulfed it. The drivers' and attendant's efforts were for naught; all but one horse burned to death and sadly the horse that escaped was killed when it ran into traffic.

## III. PROCEDURAL HISTORY

On August 19, 1996, Jackson filed suit in the Fayette County Circuit Court against Brook Ledge. In his complaint Jackson alleges that the death of Dream Fulfilled was caused by Brook Ledge's negligence, recklessness, and gross negligence. In his original complaint, Jackson sought damages for the aforementioned state torts as well as for breach of contract. On September 6, 1996, Brook Ledge removed plaintiff's action to this Court based upon federal question jurisdiction over the Carmack Amendment, 49 U.S.C. § 11707, *et seq.* Thereafter, plaintiff filed an amended complaint to include a cause of action under the Carmack Amendment.

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant moves the court for summary judgment. In sum, Brook Ledge argues that plaintiff's state law claims should be dismissed, as they are preempted by the Carmack Amendment. Furthermore, under federal law, Brook Ledge concedes liability for the loss incurred by Jackson but challenges the extent of recovery sought, which defendant claims is not consistent with the Carmack Amendment or the bill of lading which defendant contends limits the liability of Brook Ledge to $1,000. In short, plaintiff does not dispute that the Carmack Amendment preempts plaintiff's state law claims but

does argue that Brook Ledge's bill of lading does not operate to limit Brook Ledge's liability for several reasons and thus said motion should be denied.

### A. Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir.1993) (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Companies,* 8 F.3d 335, 340 (6th Cir.1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson,* 477 U.S. at 252. "If the evidence is merely colorable, or is not

---

**7.** The trailer was not equipped with an intercom for the attendant to communicate with the truck driver. However, in place was a warning light system. The attendant could press a switch which would turn on a light outside the trailer that the driver could see in the rear view mirror. Apparently, the driver did not see the warning light, if in fact it was activated.

significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

## B. Analysis

There are several issues for the Court to address in deciding whether summary judgment should be granted in favor of the defendant, to wit, (1) whether plaintiff's common law claims for negligence, recklessness, and gross negligence, and for breach of agreement are preempted by the Carmack Amendment; and (2) whether the bill of lading at issue limits Brook Ledge's liability to Jackson for the loss of the filly to $1,000. The Court takes each issue in turn.

### 1. The Carmack Agreement preempts plaintiff's state common law claims.

■ In 1906, Congress enacted the Carmack Amendment so.as to create a national policy regarding an interstate carrier's liability for property loss. *See New York, New Haven & Hartford Railroad Co. v. Nothnagle,* 346 U.S. 128, 131, 73 S.Ct. 986, 97 L.Ed. 1500 (1953). With enactment of the same came uniformity of law with respect to damaged cargo and the rights and liabilities of all those involved. *Id.; Hughes v. United Van Lines, Inc.,* 829 F.2d 1407, 1413 (7th Cir. 1987), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988). The Sixth Circuit, along with seven other circuits, have held that the Carmack Amendment preempts state and common law claims and remedies for cargo damaged in interstate transport. *See e.g., W.D. Lawson & Co. v. Penn Central Co.,* 456 F.2d 419, 421 (6th Cir.1972); *Shao v. Link, Cargo (Taiwan) Limited,* 986 F.2d 700, 706–707 (4th Cir.1993); *Hughes Aircraft Co. v. North American Van Lines, Inc.,* 970 F.2d 609, 613 (9th Cir.1992); *Underwriters of Lloyds of London v. North American Van Lines,* 890 F.2d 1112, 1113 (10th Cir.1989); *Intech, Inc. v. Consolidated Freightways, Inc.,* 836 F.2d 672, 677 (1st Cir.1987); *Hughes,* 829 F.2d at 1415; *Hopper Furs, Inc. v. Emery Air Freight Corp.,* 749 F.2d 1261, 1264 (8th Cir.1984); and *Air Products and Chemicals, Inc. v. Illinois Central Gulf Railroad Co.,* 721 F.2d 483, 486 (5th Cir.1983). Accordingly, the Carmack Amendment provides the exclusive remedy for an action for damages against a delivering carrier.

■ The situation at bar mandates that this Court dismiss plaintiff's common law claims, to wit, negligence, recklessness, and gross negligence, and breach of agreement, as plaintiff's claims fall squarely within the exclusive ambit of the Carmack Amendment. Plaintiff, through his agents, requested that Brook Ledge, a common motor carrier engaged in transporting horses in interstate commerce, transport Dream Fulfilled from Florida to Kentucky. In transport, Dream Fulfilled was fatally injured. The case law dictates that the statutory federal remedy provided in the Carmack Amendment, 49 U.S.C. § 11707, precludes plaintiff from pursuing his common law claims.

### 2. Brook Ledge limited its liability to Jackson to $1, 000 via the bill of lading.

The Carmack Amendment limits a shipper's recovery of damages for damaged or lost goods to the "actual loss or injury to the property" occurring to the goods while in the possession of an interstate carrier, unless the carrier limits its liability under 49 U.S.C. § 10730. 49 U.S.C. § 11707;[8] *see also,*

8. The nuts and bolts of the liability provision of the Carmack Amendment are as follows:

> (a)(1) A common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under subchapter I, II, or IV of chapter 105 of this title shall issue a receipt or bill of lading for property it receives for transportation under this subtitle. That carrier and any other common carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Commission under subchapter I, II, or IV, are liable to the person entitled to

·recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (1) the receiving carrier, (2) the delivering carrier, or (3) another carrier over whose line or route the property is transported in the United States ... when transported under a through bill of lading and applies to property reconsigned or diverted under a tariff field under subchapter IV of Chapter 107 of this Title. Failure to issue a receipt or bill of lading does not effect the liability of a carrier or freight forwarder.

*North American Van Lines, Inc. v. Pinkerton Security Systems, Inc.,* 89 F.3d 452, 456 (7th Cir.1996). In brief, a carrier may limit its liability for loss or injury to the "value established by a written declaration of the shipper or by a written agreement between the carrier or freight forwarder and shipper [that evidences an absolute, deliberate and well informed choice by the shipper] if that value would be reasonable under the circumstances surrounding transportation." 49 U.S.C. § 10730;[9] *Carmana Designs Ltd. v. North American Van Lines, Inc.,* 943 F.2d 316, 319 (3rd Cir.1991). By bargaining with the extent of the limitation to be placed on the carrier's liability, the shipper can negotiate a reduced rate of transportation. *See, e.g., Robinson v. Ralph G. Smith, Inc.,* 735 F.2d 186, 190 (6th Cir.1984).

■ In order to effectively limit its liability, a carrier must jump through the requisite hoops. *Carmana Designs,* 943 F.2d at 319 ("courts ... carefully scrutinize agreements purporting to limit such liability.") To wit, the carrier must: (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission ("ICC"); (2) obtain the shipper's agreement as to his/her choice of liability; (3) give the shipper reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment that reflects such agreement. *Norton v. Jim Phillips Horse Transp., Inc.,* 901 F.2d 821, 827 (10th Cir.1989) (*quoting Hughes,* 829 F.2d at 1415–16); *Hughes Aircraft Company,* 970 F.2d at 611–12. The carrier bears the burden of establishing that it has met each of the above-stated prerequisites. *Carmana,* 943 F.2d at 319.

The Court examines whether defendant has met each prerequisite in turn below.

***i. At all times relevant to this action, Brook Ledge maintained a tariff within the prescribed guidelines of the ICC.***

Due to a major change in the statutory framework of the law in the area of carriers, this Court finds that the first prong of the test is no longer applicable. The Trucking Industry Regulatory Reform Act of 1994 ("TIRRA"), eliminated the requirement that Brook Ledge maintain a tariff on file with the ICC, effective August 26, 1994. 49 U.S.C. § 13710(a). Thus, as of that date, all tariffs then on file with the ICC were declared null and void. 49 U.S.C. § 13710(a)(4). Congress replaced the tariff requirement with the following mandate:

> A motor carrier of property ... shall provide to the ·shipper, on request of the shipper, a written or electronic copy of the rate, classification, rules, and practices, upon which any rate applicable to its shipment or agreed to between the shipper and carrier is based.

42 U.S.C. § 13710(a)(1). Accordingly, this Court finds that the first prong of the test shall be succeeded by the directive found in the TIRRA provision set forth above. Thus, instead of the carrier being required to maintain a tariff with the ICC, the carrier must "provide to the shipper, on request of the shipper, a ... copy of the rate, classification, rules, and practices, upon which any rate ... is based." *Id.*

At all times relevant to this action, Brook Ledge maintained a tariff which contained the terms and conditions under which shipment would occur despite the fact that it was no longer required by law to file its tariff with the ICC.[10] In accordance with its tariff,

---

...

(c)(4) A common carrier may limit its liability for loss or injury of property transported under section 10730 of this title.

49 U.S.C. § 11707.

**9.** The limitation provision of the Carmack Amendment provides in pertinent part:

The Interstate Commerce Commission ... may require or authorize a carrier ... providing transportation or service subject to its jurisdiction under subchapter I, II, or IV of chapter 105 of this title, to establish rates for transpor-

tation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation.

49 U.S.C. § 10730.

**10.** While the TIRRA provision rendered all tariffs then on file with the ICC null and void, TIRRA did not prevent carriers from maintaining its tariffs and operating pursuant thereto as long as

in its bill of lading, Brook Ledge set forth the terms and conditions of shipment as well as the charges for shipment applicable in the event no excess declared value was identified by the shipper. Specifically, the bill of lading provided that: "The Carrier's [Brook Ledge's] Basic Rate per animal is determined by its applicable tariff including supplements in effect at the time of shipment. All tariffs with supplements have been accepted by the Interstate Commerce Commission or applicable state agency and are matters of public record." Furthermore, in its bill of lading, Brook Ledge stated that there would be "an additional charge, to wit $0.50 for each $100 or a fraction thereof of such excess valuation for each hundred miles or fraction thereof of distance between points of origin and destination, for shipments in which a value is in excess of $1,000.00."

In light of the foregoing, the Court finds that Brook Ledge would have met the first requirement of the original four-prong test, if the same were applicable. Furthermore, with respect to the replacement prong of the test, the Court finds that because the shipper did not request a copy of the rate, classification, rules, and practices, upon which any rate applicable to its shipment or agreed to between the shipper and carrier is based, Brook Ledge was not required to supply the same. However, Brook Ledge could have furnished such information, if it were solicited, as such information was contained in its tariff on file with the ICC as disclosed by Brook Ledge's bill of lading. Accordingly, the Court finds that Brook Ledge has satisfied the new first prong of the test.

### ii. *Brook Ledge obtained the shipper's agreement as to his choice of liability.*

In the case subjudice, Brook Ledge obtained the signature of the groom of Dream Fulfilled, Watson, on the Bill of Lading prior to the movement of the filly. Watson signed off on the $1,000.00 liability limitation provision. At first blush, it appears that Watson

signed away the fate of plaintiff's lawsuit without knowledge of the contents of the contract into which he entered on behalf of plaintiff. However, this case demands a closer look at the issues of informed consent and the binding authority created by the principles of agency, so as to determine whether Brook Ledge obtained the shipper's agreement as to his choice of liability.

■ The Court must first decide whether Watson had the authority to sign the bill of lading for plaintiff and thus bind the latter to the terms of the liability limitation. It is clear from the nature of the arrangement between Jackson and his hired trainer, Daisey, that the latter, acting as Jackson's agent, had the authority to transport Dream Fulfilled. Additionally, according to the current case law, Watson, the groom hired by Daisey and thus Jackson's sub-agent, had the authority to perform acts related to the transportation of Jackson's horses which consequently bound Jackson. *Norton*, 901 F.2d at 828-9 (in general, in the horse transportation industry, horse owner's agents have the authority to enter into bill of lading type contracts which limit a carrier's liability); *Robinson*, 735 F.2d at 191. Accordingly, the Court finds that Watson had the authority to sign for and thus bind Jackson to the terms of the bill of lading at issue.[11]

■ With respect to the issue of informed consent, plaintiff and his agents, as experienced shippers, are presumed to have constructive knowledge of the liability limitation provisions applicable to shipments in interstate commerce. *Norton*, 901 F.2d at 828; *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103, 108 (1st Cir.1978) ("Shippers are charged with notice of terms, conditions, and regulations contained in the tariff schedule pertaining to a carrier's liability which in turn affect the rates charged with carriage of goods."). Moreover, plaintiff and his agents were given specific constructive knowledge of the terms and conditions of shipment in the bill of lading which contains the agreement of

carriers also complied with the new statutory provisions of the TIRRA.

**11.** If Watson did not have the authority to sign the bill of lading, the Court questions why Daisey was not at work to sign the bill of lading himself

on the day he knew that Brook Ledge was scheduled to pick up the filly or why he did not make arrangements for someone with authority to sign the bill of lading.

the carrier and shipper as to the limitation on Brook Ledge's liability. *Robinson*, 735 F.2d at 191 (1984). Finally, the Court notes that "one who signs a contract in the absence of fraud or deceit cannot avoid it on the grounds that he did not read it or that he took someone else's word as to what it contained". *Chandler v. Aero Mayflower Transit Co.*, 374 F.2d 129, 136 (4th Cir.1967). In light of the foregoing, the Court finds that in theory, Watson made an informed decision to opt for the lesser shipping rate in exchange for limiting the carrier's liability to $1,000.00.

Thus, the Court finds that Brook Ledge satisfied the second prong of the test, in that it obtained the shipper's agreement as to his choice of liability.

### iii. *Brook Ledge gave the shipper reasonable opportunity to choose between two or more levels of liability.*

Similar to the charging of knowledge to the shipper as discussed above, Courts have found that with respect to the requirement that the carrier give the shipper a reasonable opportunity to choose between two or more levels of liability, the shipper is charged with the knowledge of the applicable tariff provisions and the consequences which stem from leaving the released value spaces blank. *W.C. Smith, Inc. v. Yellow Freight Systems, Inc.*, 596 F.Supp. 515, 517 (E.D.Pa. 1983). *See also, Robinson*, 735 F.2d 186; *Husman Constr. Co. v. Purolator Courier Corp.*, 832 F.2d 459, 461 (8th Cir.1987) ("It is not necessary that an employee of the carrier explain the option to declare a higher value to the shipper.... Rather, the carrier must provide only reasonable notice of the opportunity to declare a higher value."). Moreover, plaintiff was put on notice of his choice by the content of the bill of lading at issue, which has been previously discussed, signed by Watson, Jackson's sub-agent.

Accordingly, the Court finds that insofar as Jackson knew, via the constructive knowledge of his sub-agent, about the levels of liability as set forth in Brook Ledge's tariff as well as in its bill of lading which would apply to the amount of coverage afforded to Dream Fulfilled, Brook Ledge provided the shipper reasonable opportunity to choose between two or more levels of liability.

### iv. *Brook Ledge issued a receipt or bill of lading prior to moving the shipment that reflects the relevant agreement.*

It is not disputed that prior to transporting Dream Fulfilled from Florida to Kentucky, Brook Ledge employee Mariano presented to Watson a bill of lading, which had been completed by the carrier. After Watson signed the bill of lading, Mariano separated the four-part bill of lading and gave Watson the "shipper's copy". Thus, Brook Ledge issued a bill of lading and met the last requirement of the four-part test.

### V. CONCLUSION

For the aforementioned reasons, the Court finds plaintiff's common law claims for negligence, recklessness, and gross negligence, and for breach of agreement are preempted by the Carmack Amendment and that the bill of lading at issue in this case effectively limits Brook Ledge's liability to Jackson to $1,000. Hence, the Court, being otherwise fully and sufficiently advised, the HEREBY ORDERS that defendant's motion for summary judgment [docket entry 37] IS GRANTED, AND A JUDGMENT SHALL BE ENTERED CONTEMPORANEOUSLY WITH THIS ORDER IN FAVOR OF THE DEFENDANT, BROOK LEDGE, INC.

### JUDGMENT

In accordance with the Opinion and Order entered contemporaneously with this Summary Judgment, the Court hereby ORDERS AND ADJUDGES:

(1) summary judgment is entered in favor of the defendant, Brook Ledge, Inc.,

(2) this matter is DISMISSED WITH PREJUDICE;

(3) this judgment is final and appealable, and no just cause for delay exists; and

(4) this matter is STRICKEN from the active docket.