STRICKLAND TRANSPORTATION COMPANY, Inc., Appellant,

v.

UNITED STATES of America, Appellee.

T.I.M.E. FREIGHT, INC., Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 20409, 20360.

United States Court of Appeals Fifth Circuit.

July 8, 1964.

No. 20409:

Ralph W. Currie, Dallas, Tex., Muse, Currie & Kohen, Dallas, Tex., of counsel, for appellant.

Joseph McElroy, Jr., Asst. U. S. Atty., Dallas, Tex., Terence N. Doyle, Alan S. Rosenthal, Attys., John W. Douglas, Asst. Atty. Gen., Barefoot Sanders, U. S. Atty., Dept. of Justice, Washington, D. C., for appellee.

No. 20360:

W. D. Benson, Jr., Lubbock, Tex., for appellant.

Terence N. Doyle, Alan S. Rosenthal, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before BROWN, WISDOM and BELL, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

These two cases involving separate judgments in a number of separate cases filed by each of the Carriers [1] against the United States as shipper, although briefed and argued separately, present the common question of the construction and application of a published tariff. The appeal of T.I.M.E. has two further points. In each appeal we affirm, thus rejecting the contentions of the Carrier.

### I.

The facts were stipulated and may be briefly summarized. In doing so we have drawn heavily on the briefs in making our way through the tariffese.

Between 1954 and 1959 the United States shipped aircraft engines between various points in the United States. All of the shipments were made under U.S. Government Bills of Lading and the United States was billed for the transportation charges by the Carrier.

Upon presentment, and without first being audited by the General Accounting Office, the bills submitted by the Carrier were paid by the United States as required by Section 322 of the Transportation Act of 1940, 54 Stat. 955, 49 U.S.C.A. § 66.[2] However, the General Accounting Office made post-payment audits of the charges paid and concluded that the Carrier had overcharged the United States. Therefore, pursuant to the rights reserved to it by Section 322 of the Transportation Act of 1940, the Government deducted the overpayments from amounts then due the Carrier for other shipments. This action followed.

The only issue in this Part is the applicable tariff provision for the shipments involved. However, before examining the competing tariff provisions in issue here, a brief explanation of the technical terms involved in these tariff provisions is helpful.

The basic element of the transportation rate scheme is the tariff rate—a dollars and cents amount stated as the rate per hundred pounds between two geographical locations. Variables of the basic rate are necessary to take into account such considerations as the type of merchandise being transported.

One of the factors utilized to vary the basic rate is a "classification rating," which is merely a stated per cent of the basic or first-class rate. Uniform classification ratings have been established on a nationwide basis on most of the articles that may be transported by carriers. These classification ratings are established in the National Motor Freight Classification (NMFC).

In addition to the uniform classification ratings, the basic rate may also be varied by the carriers to suit the exigencies of particular geographical areas. This is customarily done by "exceptions" to the uniform classification which the carriers or their regional agents may publish. These exceptions in effect amend, and usually lower, the classification ratings for designated articles and establish new ratings which, again, are a stated per cent of the first-class rate.[3]

▇▇ Also much discussed and warranting a brief explanation is the technical term "released value" or "released valuation." Although Section 20(11) of the Interstate Commerce Act, 49 U.S.C.A.

1. In No. 20409: Strickland Transportation Company, Inc. In No. 20360: T.I.M.E. Freight, Inc. Each are certificated motor carriers.

2. Section 322 of the Act, 49 U.S.C.A. § 66, was amended by the Act of August 26, 1958, 72 Stat. 860. We discuss this in Part II on T.I.M.E.'s limitation contentions.

3. The nature of the rating structure is similarly summarized in New York v. United States, 1947, 331 U.S. 284, 289-290 nn. 1, 2, 3, 67 S.Ct. 1207, 91 L.Ed. 1492.

§ 20(11),[4] provides that carriers shall be liable for the full, actual loss, damage or injury to property delivered to them, a carrier's liability may be limited by agreement upon a "released value" of a shipment, i. e., the value declared by the shipper and to which he is limited in case of loss or damage to the shipment. Released value rates are lower than unreleased rates since the carrier's liability is limited and, in effect, the shipper becomes a co-insurer of the shipment.[5]

With this preliminary, we may now consider the relevant tariff provisions in effect at the time of the shipments involved here. Specifically, the Government contends that the properly applicable rating for all the shipments is the uniform classification rating on engines shipped at released value. On the other hand, the Carrier relies upon exception ratings on engines shipped at full or unreleased value, contending that its exception cancelled the released value ratings of the uniform classification.

In the NMFC tariff,[6] item 61247 shows an LTL rate of 150 for unreleased shipments, i. e., those made at full value. Under item 61244 for shipments at a released value of $2.50 or less, the LTL rate is 85, and for values of $2.51–$5.00, the LTL rate is 100. The exception tariff

4. Section 219 of the Act, 49 U.S.C.A. § 319, provides that § 20(11) is applicable to all motor carriers subject to the Act.

5. Express authorization of the Commission is required for carriers to establish and maintain released value rates. See generally, Fort Worth & Denver Ry. v. United States, 5 Cir., 1957, 242 F.2d 702; People's Express Co., 311 I.C.C. 515, 516; American Home Foods, Inc. v. Delaware, L. & W. R. Co., 303 I.C.C. 655, 657.

6.

| Item | Articles | Ratings LTL | At Vol. | At Vol.Min. Wt.-Lbs. |
|---|---|---|---|---|
| 61243 | Engines, internal combustion, NOI: | | | |
| 61244 | Each article released in value in accordance with the following, see Notes, items 61245 and 61246: | | | |
| | Released to value not exceeding $2.50 per pound ............................. | 85 | 45 | 24,000 |
| | Released to value exceeding $2.50 per pound but less than $5.00 per pound .... | 100 | 50 | 24,000 |
| 61245 | Note—The released valuation, which shall be deemed to relate to each article separately and not to the shipment as a whole, shall be entered on the shipping order and bill of lading in the following form: "The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding .... per pound for each article." (The released values upon which the ratings herein are dependent have been authorized by the Interstate Commerce Commission by Released Rates Order No. MO-296, FF-82, of February 23, 1949, subject to complaint or suspension.) | | | |
| 61246. | Note— * * * | | | |
| 61247 | Value of the property not declared or released in accordance with the provisions of item 61244, see Notes, items 61248 and 61249 .... | 150 | T 70 | W 24.6 |
| * * * | * * * | | | |
| 61249 | Note— * * * | | | |

for the Southwestern territory [7] and for the Rocky Mountain territory [8] each specify specific ratings for (a) radial-jet type engines, and (b) engines not radial or jet type. The center of this dispute is Note 1 (and its variant, Note 2) that "the released valuation provisions as shown in NMFC No. A–3 [see note 6, supra] will not apply in connection with the ratings shown in this item."

The Carrier urges that as to these Government aircraft engines, the Exception (notes 7 and 8) superseded the entire NMFC ratings, note 6. The Government, on the other hand, insists that by the words of Note 1 only so much of NMFC as pertained to *un*released shipments (Item 61247, note 6) was superseded, thus leaving intact Item 61244.

■ Were this problem left to us as a strict matter of tariff construction in the good old fashioned approach of con- tract analysis, the Carrier could not possibly sustain this appeal. As a minimum, following United States v. Western Pacific R. R., 1956, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126, we would have to vacate the judgment with directions to refer this to the Interstate Commerce Commission for Primary Jurisdiction determination of the transportation policies inescapably mixed up in the operative effect of these classifications, exceptions, released and unreleased shipments. If not that, the judgment would have to be affirmed on the familiar principle that where " * * * there is an ambiguity in the tariff and it is not made clear under which rating the article shipped come, the ambiguity must be resolved in favor of the shipper, and the lower rate must be awarded to him." United States v. Strickland Transp. Co., 5 Cir., 1952, 200 F.2d 234.[9]

7.  EXCEPTIONS TO NMFC NO. A-3 RATINGS

| Item No. | Articles | Class Ratings |
|---|---|---|
| | Machinery or Machines or Parts Named, viz.: | |
| | Engines, Internal Combustion, NOI (Note 1): | |
| | In Boxes, Crates or in Steel Containers 16 gauge or thicker. | |
| | Radial Cylinder type or Jet Propulsion type. | |
| 1350 | LTL ...................................... | 100 |
| | Vol. Min. wt. 20,000 lbs. .................... | 55 |
| | Other than Radial Cylinder type or Jet Propulsion type. | |
| | LTL ...................................... | 85 |
| | Vol. min. wt. 20,000 lbs. .................... | 45 |

Note 1—The released valuation provisions as shown in NMFC No. A-3 will not apply in connection with the ratings shown in this item.

8.  In form and the ratings specified, this is substantially the same as the Southwestern Exceptions, note 7, supra, save that it makes no reference to "In Boxes, Crates or in Steel Containers 16 gauge or thicker." But there are two notes. Note 2 serves the purpose of Southwestern Note 1 and makes specific reference to the released items in NMFC tariff, note 6, supra.

NOTE 1—Ratings apply on engines and accessory attachments on related parts pertaining thereto attached to the engine or enclosed in the same package for installation with, or attached to, the engine shipped in the same container.

NOTE 2—The released valuation provisions as shown in Items 61244, 61245, 61246, 61247, 61248 and 61249 series in the current classification will not apply in connection with the ratings shown in this item.

———◆———

9.  See also United States v. Missouri Pacific R. R., 5 Cir., 1958, 250 F.2d 805; United States v. Missouri-Kansas-Texas R. R., 5 Cir., 1952, 194 F.2d 777; At-

■■ Of course there is still some room left for court construction of tariffs without primary jurisdiction referral to the Commission,[10] but we must resist the temptation to take the ambiguity route as an easy and quicker way out. Hence, on the Court's own motion during argument, we raised the serious question of referral of this tariff construction problem to the Commission in the first instance. The supplemental briefs and careful consideration convince us that there is no need for referral here. This is not because the task of divining the meaning of these words is so simple, or the proper result so clear that Judges untrained in the transportation business have sufficient insight to resolve it. On that approach, referral would be essential. Rather, we decline referral because it is not needed since the Commission "in prior * * * opinions, has already construed" tariffs resembling "the particular tariff at issue" and, in any event, it "has clarified the factors underlying it." United States v. Western Pacific Railroad Co., supra, 352 U.S. 5,9, 69, 77 S.Ct. 161, 168, 1 L.Ed.2d 126.

We thus agree with the Government that the Commission has resolved this construction problem in three decisions which are directly in point. American Home Foods, Inc. v. Delaware, L. & W. R. Co., 303 I.C.C. 655; Upjohn Co. v. Pennsylvania R. Co., 306 I.C.C 325; Dow Chemical Co v. Chesapeake & Ohio R. Co., 306 I.C.C. 403.[11]

In American Home Foods, the carrier assessed charges for coffee shipped in carloads at released value. This was done on the basis of an exception rating for coffee which, like the exception in controversy here, made no provision for released value shipments. The shipper contended that the properly applicable rating was that provided by the uniform classification. That classification, like the uniform classification involved here, provided two ratings for coffee—one rating for coffee shipped at released value and one rating for coffee shipped without a declaration of released value. As is true with the present case, the sole issue was whether the exception rating superseded both the released value rating and the unreleased value rating or merely superseded the unreleased value rating. The full Commission concluded that the exception superseded only the unreleased value provisions of the uniform classification (303 I.C.C. at 656–657).:

"The [carriers] contend that the exceptions rating on instant coffee superseded both the unreleased-and released-value classification ratings. They maintain that the language of the exceptions item is specific; that there is no expressed intent that the exceptions rating should supersede only unreleased-value ratings; and that there are no differences in the commercial or transportation characteristics of the commodity described in the several items naming rates on instant coffee, whether released or not released in value. * * *

"* * *

"As stated, the [carriers] contend that there are no differences in the commercial or transportation characteristics of the commodity described in the several items naming rates on instant coffee, whether released or not released in value. It seems apparent that from a commercial standpoint there was no difference in the coffee (assuming it was of the same grade) whether its value was released or not released, but it is equally apparent that there was a distinct difference from a transportation standpoint by reason of

lantic Coast Line R. R. v. Atlantic Bridge Co., 5 Cir., 1932, 57 F.2d 654; cf. Hohenberg v. Louisville & Nashville R. R., 5 Cir., 1931, 46 F.2d 952.

10. In United States v. Western Pacific R. R., 1956, 352 U.S. 59, at 65, 77 S.Ct. 161, 1 L.Ed.2d 126, the Court declined to

administer the last rites to Great Northern Railroad Company v. Merchants Elevator Co., 1922, 259 U.S. 285, 42 S. Ct. 477, 66 L.Ed. 943.

11. All three of these decisions were rendered upon reconsideration by the entire Commission. 49 U.S.C.A. § 17(6).

the shipper's declaration as to value. If the exceptions rating had been subject to a released value of 50 cents a pound, it obviously would have had no application in the absence of a declaration of value by the shipper and the higher unreleased classification rating would have applied. Stated differently, an exceptions rating subject to a released value of 50 cents a pound would not have removed the unreleased rating from the classification, and conversely we conclude that the unreleased exceptions rating did not remove the released rating from the classification."

By this decision, and the two others which expressly followed it,[12] the Commission's action reflects two things, each of which rest upon the administrative judgment of the Commission in the development of a sound transportation policy. The first is that a specific commodity shipped with a lowered valuation (released) is to be considered for transportation purposes as distinctly different from the same commodity shipped without limitation on value (unreleased). The second, flowing directly from the first, is that to supersede all, the language of the exception must clearly indicate that it is intended to supersede both the released items and the unreleased items.

12. In Upjohn Co. v. Pennsylvania R. Co., 306 I.C.C. 325, there were two ratings in the uniform classification for "drugs, medicines, or toilet preparations," one for unreleased value and a separate one for released value shipments. The full Commission rejected the carrier's contention that a commodity rate not contingent upon released or unreleased value superseded both of these classification ratings.

Similar treatment was given in Dow Chemical Co. v. Chesapeake & O. Ry. Co., 306 I.C.C. 403. Aniline oil was listed under two separate items in the uniform classification. One item specified Aniline oil shipped at released value, the second item made no mention of released value. An exception item for Aniline oil made no mention of released value.

On the Commission's approach, the process of interpretation goes through these steps. First, excluding from the operation of the Exception rating, the ratings for released shipments under NMFC, the Carrier declares that only *unreleased* shipments may move under the Exception rating. Second, this necessarily supersedes that part of NMFC calling for *unreleased* shipment (item 61247, note 6, supra). And third, the Exception having no purpose to permit *released* shipments could not reasonably have been intended to supersede the *released* ratings in NMFC (61244, etc.). Consequently, a shipper may have the benefit of the cheaper rate by making a released shipment.

■ Whether this makes sense is beside the point. It all depends on what kind of sense is being made—abstract, contractual interpretation sense, or transportation-railroading sense. If the policy reflected by the ICC decisions is reasonably sound, then uniformity of application so essential in a regulated transportation industry makes it important that courts give their imprimatur to the policies thereby reflected. Efforts by courts, no matter how plausible on traditional construction principles, to avoid the impact of the general policy by refined distinctions based on terminology will inevitably impinge on uniformity and thereby put the court in the transportation-regulating business.[13]

The full Commission held that "from a transportation standpoint" the ratings should be considered "as separate and distinct items."

13. Nothing in the ICC policy forbids crystal-clear draftsmanship. The record shows that this was subsequently done in Note 2 (see note 8, supra) by amendment to the exception so that it reads:

"The provisions of this item remove all class ratings, including the released valuation provisions shown in items 61244, 61245, 61246, 61247, 61248, and 61249 series of the current classification [NMFC]. Neither the ratings nor the released valuation provisions shown in items 61244, 61245, 61246, 61247, 61248 and 61249 of the current classification apply in connection with rates in this tariff."

■ The trial Court correctly applied this construction to the tariffs.

## II.

Accepting this reading of the tariff, T.I.M.E. nevertheless advances two separate contentions, neither of which we find supportable.

The first is that the Government, as Shipper, failed to comply with the requirement of the tariff (Item 61245, note 6, supra) requiring that the bill of lading bear the legend: "the agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding * * * per pound for each article."

■ Without engaging in the sometime troublesome problem of ascertaining just when it is that the United States is, or is not, the same as a private shipper, we think there has been substantial compliance since the standard uniform Government Bill of Lading declares the universal purpose to get the most transportation at the cheapest rate.[14]

The purpose of Item 61245 is to enable the Carrier to know that the shipment is moving at a lower valuation. As the Commission pointed out in the three cases discussed, this is important from an operational standpoint, and it is reasonable from the standpoint of claims handling. But here there is no uncertainty. The Government, in the absence of affirmative declaration to the contrary, intends thereby to ship at the lowest possible rate, and if that can only be accomplished by a limitation in value (release shipment), it is the purpose of the Government to declare that value. If not a literal, it was nonetheless, a substantial compliance. Glickfeld v. Howard Van Lines, 9 Cir., 1954, 213 F.2d 723; Campbell "66" Express Co., Inc. v. United States, Ct.Cl., 1962, 302 F.2d 270.

Next, but no more substantial, is T.I.M.E.'s contention that the "limitation of action" of § 204a of the Interstate Commerce Act, 49 U.S.C.A. § 304a, precludes the United States from deducting or offsetting transportation overcharges more than two years after payment of the charges. This necessarily brings into question § 322 of the Act, 49 U.S.C.A. § 66, requiring payment by the Government of carrier invoices on presentation without preaudit but reserving to the Government "the right * * * to deduct the amount of any overpayment to any such carrier from any amount subsequently found to be due such carrier."[15]

■ The legislative history of § 322, discussed at length in United States v. New York, New Haven & H.R.R., 1957, 355 U.S. 253, 78 S.Ct. 212, 2 L.Ed.2d 247, and the action of the Court in that case and in United States v. Western Pacific R. R., 1956, supra, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126, convince us that deductions or setoffs of overcharges for pre-1958 shipments are never time-barred. The Court rejected the argument which T.I.M.E. makes here that since the statute allowing recovery of overcharges extinguishes the *right* after two years as to a shipper seeking affirmative recovery, the same result must follow to forbid deductions or offsets. In enacting § 322 it was the congressional purpose to afford immediate payment to carriers, but to provide full protection to the Government by post-audit procedures. Con-

14. After the introductory phrase binding the carriers to the terms of the bill of lading, it provided:

"5. This shipment is made at the restricted or limited valuation specified in the tariff or classification at or under which the lowest rate is available, unless otherwise indicated on the face thereof."

15. Sections 322 and 204a of the Act, 49 U.S.C.A. §§ 66 and 304a, respectively, were amended by the Act of August 26, 1958, 72 Stat. 860. The amendment of § 322 expressly limited the Government's right to deduct overcharges to a period of 3 years after payment of the original bill. The amendment of 204a limited the Government's right to affirmative action for overcharges to 3 years. See S. Rep. 334, 85th Cong., 1st Sess. Applicable only to transportation performed and payments made after August 26, 1958, the amendments do not directly affect the claims involved here.

gress put no time limitation on the § 322 "right * * * to deduct the amount of any overpayment * * * from any amount subsequently found to be due * * *." Experience apparently demonstrated that this was unwise. Congress, as it had done in enacting § 322, thought it wise to change that policy. The legislative history of the 1958 changes reflects two things. The first is the congressional awareness of the pre-1958 law, that "the right of the Government to deduct for overpayment is not limited as to time." The second is the legislative judgment then reached that "the committee believes that a reasonable time limitation should be established for such deductions."

Consequently, on neither of these contentions does T.I.M.E. prevail.

Affirmed.