**ROHNER GEHRIG COMPANY, INC.,**
Plaintiff–Appellee,

v.

**TRI–STATE MOTOR TRANSIT,**
Defendant–Appellant.

No. 89–6246.

United States Court of Appeals,
Fifth Circuit.

Feb. 15, 1991.

Stuart W. Lapp, Chris C. Pappas, Dunn, Kacal, Adams, et al., Houston, Tex., Thomas V. Bender, Kyle E. Krull, Linde Thomsom Langworthy Kohn & Van Dyke, P.C., Kansas City, Mo., for defendant-appellant.

A. Douglas Shackelford, Jr., Billings & Solomon, Houston, Tex., for plaintiff-appellee.

Before GARWOOD and WIENER, Circuit Judges, VELA, District Judge.[1]

FILEMON B. VELA, District Judge:

Tri–State Motor Transit (Tri–State) appeals a grant of summary judgment in favor of the plaintiff Rohner–Gehrig (Rohner) and a denial of its motion for summary judgment. Based upon the record before us we find that the district court did not have sufficient grounds to grant Rohner summary judgment but was warranted in denying Tri–State's motion for summary judgment. We therefore REVERSE in part and AFFIRM in part.

## I. The Facts.

*When it absolutely positively has to get there.*

In 1906, Congress enacted the Carmack Amendment (now at 49 U.S.C. § 11707

---

1. District Judge of the Southern District of Texas, sitting by designation.

[Supp.1990]) which prohibited carriers from limiting their liability in any way.[2] As a result, carriers began to charge exorbitant rates for shipments insured at full value. Congress reacted by enacting the Cummings Amendment (now at 49 U.S.C. § 10730 [Supp.1990]) which allows carriers to limit liability, but gave the ICC the power to approve rates through "tariffs."[3] A tariff is a document filed by the carrier and published by the ICC listing several freight rates available to shippers for different types of equipment. The tariff is not part of the bill of lading given to the shipper, but rather a separately published document incorporated by reference into the bill of lading.

Each rate in a tariff carries a corresponding level of liability per pound which is termed a "released rate." A higher freight rate, therefore, secures a higher level of liability. When a tariff contains an inadvertence clause[4] and a shipper fails to declare a value in the bill of lading, then the shipper is insured at the lowest rate permitted in the tariff. The inadvertence clause is usually incorporated into the bill of lading-

ing in the released rate clause by a sentence which states that if the shipper fails to state a released rate, the shipment is deemed released at the lowest rate or the rate listed. The shipper, therefore, is not compelled to accept the given released rate but may instead choose a higher rate by incorporating it into the bill of lading.

*Truckin'. Got my chips cashed in.*

Tri–State contracted with Rohner to ship an airplane tail assembly from Tinker Air Force Base in Oklahoma to Houston, Texas. The French Military owns the assembly and Rohner is its subrogee.

Gordon Burnett, a freight rate specialist for the Air Force signed Tri–State's freight bill (the bill of lading) as "shipper per" and as the consignor. Mr. Burnett had seven years experience as a shipping agent for the U.S. Air Force and was familiar with bills of lading and the general effect of a released rate. He did not declare a greater released rate or value for the cargo than that provided by the released rates found in the tariffs.[5]

**2.** Section 11707 states:

(a)(1) A common carrier providing transportation or services ... shall issue a receipt or bill of lading for property it receives for transportation under this subtitle.... That carrier ... [is] liable to the person entitled to recover under the receipt or bill of lading.
(c)(1) A common carrier ... may not limit or be exempt from liability imposed under subsection (a) of this section except as provided in this section.

**3.** Section 10730 states:

(a) The Interstate Commerce Commission may require or authorize a carrier ... providing transportation or services ... to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation.
(b)(1) [A] motor carrier ... may establish rates for the transportation of property under ... which the liability of the carrier ... is limited to a value established by written declaration of the shipper or by written agreement between the carrier ... and shipper if that value would be reasonable under the circumstances surrounding the transportation.

**4.** A clause stating, unless otherwise declared, the released rate is a certain value.

**5.** The tariffs filed by Tri–State are ICC NAS 203–A—the "rate tariff," and the "rule" tariff—ICC NAS 190–A. NAS 203–A, Item 856 reads:

Shippers, consignees and owners of freight are cautioned that this tariff is governed by ICC NAS 190 Series, and that Item 360 thereof provides that regardless of the actual form of bill of lading or shipping document issued to cover a shipment, such shipments moving under rates published in tariffs making reference to this tariff are governed by the contract terms and conditions of the Uniform Straight Bill of Lading set forth in Item 360–1 and 360–3. One of the Conditions set forth in such bill of lading is the following sentence which appears in bold-face type on the face thereof, "WHEN RATES ARE SUBJECT TO A RELEASED RATES ORDER, UNLESS A GREATER VALUE IS DECLARED, THE SHIPPER HEREBY RELEASES THE VALUE TO $5,000 PER TON OF 2,000 POUNDS FOR EACH ARTICLE."

NAS 190–A, Item 856 states:

Rates or ratings published in tariffs making reference to this ICC Number, to the extent that they apply for the transportation in interstate or foreign commerce of: COMMODITIES, the transportation of which, because of size or weight require, special handling, or the

In the center of the Tri–State's freight bill, above Mr. Burnett's signature, appears the released rate clause:

> Unless a Greater Value is Declared, The Shipper Hereby Releases the Value to $5,000.00 Per Ton of 2,000 Pounds for Each Article.

This portion of the shipping order (freight bill) was not set off in bold letters nor was it in larger type than the rest of the bill. Neither was there a space specifically provided for the shipper to declare a greater value as required by tariff NAS 190–A.

During shipment, the freight was damaged. Tri–State does not contest its liability, but contends that Rohner's damages are limited to the released value damages as set forth in the shipping order and in the lawfully filed tariffs applicable to the transportation of the cargo in question.

The district court found that Tri–State's bill of lading failed to comply with the tariff provisions and therefore, the released rate clause was void. Therefore, Tri–State's motion for summary judgment was denied and Rohner's granted.

## II. The Law.

Although this court has not ruled on this precise issue, it and others have enforced bills of lading that substantially (rather than strictly) comply with their related tariffs. *Eg., Robinson v. Ralph G. Smith, Inc.*, 735 F.2d 186, 190 (6th Cir.1984); *Strickland Transp. Co. v. United States*, 334 F.2d 172, 179 (5th Cir.1964). The district court did not address what test this circuit would use because it found "Tri–State's bill of lading fails to even substantially comply with the tariff." "Where, as here, questions of law control the disposition on summary judgment, we must subject the controverted issues to full appellate review." *Texas Commerce Bank–Fort Worth, N.A. v. United States*, 896 F.2d 152, 155 (5th Cir.1990) (citing *Barrett Computer Services, Inc. v. PDA, Inc.*, 884 F.2d 214, 215 (5th Cir.1989)).

### Limitation of Liability

In order for the Cummings Amendment to limit liability, the carrier must satisfy four requirements; he must "1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; 2) obtain the shipper's agreement as to his choice of liability; 3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and 4) issue a receipt or bill of lading prior to moving the shipment." *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir. 1987), *cert. denied*, 485 U.S. 913, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988) (citing *Anton v.*

use of special equipment, and RELATED CONTRACTORS' MATERIALS, SUPPLIES, and EQUIPMENT will be applicable only

| RELEASED VALUATION | RATE BASIS |
|---|---|
| When released to a value not exceeding $5,000.00 per ton of 2,000 pounds. | Base Rate |
| When released to a value exceeding $5,000.00 per ton of 2000 pounds. | Base rate with a value charged of 50¢ for each $1,000.00 or fraction thereof by which the released value exceeds $5,000.00 per ton of 2000 pounds. |

. . . . .

The released value shall be deemed to relate separately to the gross weight of each shipping package or to the weight of each loose article not enclosed in the package and not the shipment as a whole. In case of loss or damage to a portion of the contents of a shipping package, the amount recoverable

when the value of the property declared by the shipper in writing or agreed upon in writing as the released value thereof as follows:

will be the released value per ton multiplied by the gross weight of the package but not more than actual loss or damage.

The released value must be entered on the shipping order and bill of lading in the following form:

*Greyhound Van Lines, Inc.*, 591 F.2d 103 (1st Cir.1978)). The first and last requirements are evidentiary in nature and are not at issue in this case.[6] The law in this circuit, however, must be clarified in regards to the second and third elements.

### A. Shipper's Agreement

What must occur in order for a shipper to give his agreement as to his choice of liability? "Shippers are charged with notice of terms, conditions and regulations contained in the tariff schedule pertaining to a carrier's liability which in turn affect the rates charged the carriage of goods." *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103, 108 (1st Cir.1978) (citing *American Railway Express Co. v. Daniel*, 269 U.S. 40, 42, 46 S.Ct. 15, 15, 70 L.Ed. 154 (1925)). A shipper, like any consumer, should know what he is going to pay, and what he is going to get for his money. Shippers give their consent unless there is no written opportunity to make a valuation of the property and the rate of shipping. *Caten v. Salt City Movers & Storage Co.*, 149 F.2d 428, 432 (2d Cir.1945). In the case at bar, Burnett signed the bill of lading containing an inadvertence clause which made a valuation. The district court, however, found the bill of lading lacked the "notice fairness requires." That, however, is not apparent without considering the shipper's sophistication and state of mind (discussed *infra*).

### B. Opportunity to Choose

"Binding [the shipper] by a limitation which she had no opportunity to discover would effectively deprive her of the requisite choice; such an arrangement would amount to a forbidden attempt to exonerate a carrier from the consequences of its own negligent acts." *New York, N.H. & H.R. Co. v. Nothnagle*, 346 U.S. 128, 135, 73 S.Ct. 986, 990, 97 L.Ed. 1500 (1952) (footnote omitted). A carrier further must give the shipper a fair opportunity to choose among various levels of liability;

this implies the shipper had notice of the liability and had the chance to obtain information relevant to making an intelligent decision. *Hughes*, 829 F.2d at 1419.

This court has not decided whether it will require carriers' bills of lading to strictly or substantially comply with the terms of their tariffs. However, in *Strickland*, 334 F.2d at 178, this court found the United States, as a shipper, had substantially. complied with the applicable tariff. The Third Circuit approved of the ICC determination "that a bill of lading taken together with the filed tariff containing an inadvertence clause, can constitute a written agreement between the carrier and the shipper." *National Small Shipments Traffic Conference, Inc. v. United States*, 887 F.2d 443, 446 (3rd Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1947, 109 L.Ed.2d 309 (1990). The ICC, also, will enforce tariffs where some purpose is served related to the transportation provided, as long as there is no illegality. *National Small Shipments Traffic Conference, Inc. v. Consolidated Frieghtways Corp.*, MCC–30102 [available on WESTLAW, FTRAN–ICC database], 1989 MCC Lexis 38 (1989). Strict compliance of the bill of lading by the carrier would be counter productive in this light and therefore substantial compliance is sufficient.

The district court relies upon *Caspe v. Aaacon Auto Transport, Inc.*, 658 F.2d 613 (8th Cir.1981) to find no notice was supplied. The *Caspe* court found the limitation clause complied with the letter of the tariff but not its spirit. Though the clause was in the required bold print, it was buried in the agreement so it did not stand out to the reader's attention. That court also found the lack of available space to declare a different limitation as required by the contract further diminished the shipper's opportunity to fairly choose a limitation level. That case, however, involved plaintiffs unfamiliar with the business of shipping.

"The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding ___ per ton of 2,000 pounds."

**6.** The parties have not questioned the fact that Tri–State had on file a proper tariff or that a bill of lading had been issued.

■ In *Robinson v. Ralph G. Smith, Inc.*, 735 F.2d 186 (6th Cir.1984), the court distinguishes the limitation clause from the one found in *Caspe*. The bill of lading clause was similar to the one found in the tariff, and while it was not in bold print, it was set off to be noticeable. In the present case, the district court found the bill of lading did not substantially comply soley because there was no room on the document to declare a higher value, and the clause was not in bold print. Based on the record before us, we are not persuaded this conclusion is certain. If the shipper was aware of what he was signing, and the signifigance of the document, substantial compliance occurred.

### C. Sophistication

■ When confronted with a shipper, it is important to consider his sophistication. *Co–Operative Shippers, Inc. v. Atchison, T. & S.F. R. Co.*, 840 F.2d 447 (7th Cir. 1988) (holding Co–Op's sophistication weakens its argument that it failed to notice liability provisions); *Hughes*, 829 F.2d at 1421 (finding plaintiffs were "seasoned shippers of goods" and should have known the system better); *Mechanical Technology, Inc. v. Ryder Truck Lines, Inc.*, 776 F.2d 1085 (2d Cir.1985) (stating experience of shipper is a factor). A fair opportunity to choose may be different for the inexperienced mover than for the veteran businessman.

The district court relied upon *Caspe* for the proposition that, a limitation clause must be in bold print in order to give a shipper notice. However, there was no finding of whether Burnett knew about this limitation clause. While the limitation clause was not in bold, it clearly was above the place where Burnett signed. "The intent of released rates ... would be defeated if the shipper, simply by failing to state a value, obtained both a lower rate and full carrier liability." *National Small Shipments Traffic Conf. v. Consolidated Freightways Corp.*, MCC–30102 [available on WESTLAW, FTRAN–ICC database], 1989 MCC Lexis 38 (1989). While Tri–State's bill of lading did not conform perfectly with its tariff, this court is not in a position to find that Rohner, through Burnett, did not know the significance of what was signed. Before summary judgment can be granted, the district court must be satisfied the shipper neither knew nor should have known about the limitation clause and its ramifications.

### III. Conclusion.

For the above reasons, the district court correctly dismissed Tri–State's motion for summary judgment and is therefore AFFIRMED, however, the district court's grant of Rohner's motion for summary judgment is REVERSED, and is remanded to the district court for further proceedings consistent with this opinion.

WIENER, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority opinion penned by Judge Vela to the extent it announces for the first time in this circuit that bills of lading that *substantially* comply with their related tariffs may be sufficient to limit the liability of the carrier to the same extent as would bills of lading that *strictly* comply. With genuine respect, however, I am constrained to dissent from the remainder of the majority opinion that, in testing Tri–State's bill of lading for compliance with its related tariff, sanctions the purely subjective examination of the degree of sophistication possessed by the individual who completes the shipping documents on behalf of the shipper to limit the carrier's liability when those documents on their face would disallow limitation.

I read the opinion of the majority in this case to agree with the district court, as do I, that Tri–State's bill of lading facially fails to comply, either strictly or substantially, with Tri–State's tariff. That failure results first from the almost total absence in the bill of lading of notice language about the tariff and the shipper's opportunity to effect a change in the carrier's liability, and second from the facts that (1) the modicum of limitation language that does appear in the bill of lading is not printed in a bolder, larger or different type

and is not set off in a box or other indicia of special importance, and (2) there are no special blanks near the signature blank for use by the shipper in selecting different rates. So, but for its willingness to consider the degree of sophistication possessed by the particular agent of the shipper as a "circumstance[ ] surrounding the transportation," 49 U.S.C. § 10730(b), contributing to the reasonableness of limiting the carrier's liability, the majority too I sense would have found the bill of lading in neither strict nor substantial compliance with the tariff.

My concern with the majority's opinion as a significant departure from the Congressional policy regarding limitation of a carrier's liability and from the principal jurisprudence on point is not so much with its resort to consideration of sophistication—although I do feel such a resort is unwarranted under the facts of the instant case—but with the subjective examination of the degree of sophistication possessed by the individual agent of the shipper rather than the objective examination of a "reasonable shipper" similarly situated.

Even if I were to concede, arguendo, that sophistication is a circumstance to be examined, I am satisfied that the test should be objective rather than subjective. The summary judgment record in this case reflects that the shipper's employee, Burnett, was quite experienced and knowledgeable. Relying on that, the majority opinion concludes that "[w]hile Tri–State's bill of lading did not conform perfectly with its tariff, this court is not in a position to find that Rohner, *through Burnett*, did not know the significance of what was signed" (emphasis added)—clearly looking subjectively to Mr. Burnett's degree of sophistication in the industry. Presumably, then, if Rohner's employee had been a young, uneducated new hire on his first day at work, the majority would have concluded that Rohner, through its brand new employee, could not possibly have known the significance of what was signed, and thus there

would be no limitation of Tri–State's liability.

It is clear to me that that approach could lead to the anomalous result of Tri–State's facially defective bill of lading, upon presentation to the same shipper (Rohner) on consecutive days, being in compliance on one day and not in compliance on the next, depending on who might be manning the desk in the shipping department on a given day. I cannot believe Congress intended for carriers' limitations of liability to be decided on such serendipitous circumstances. This is borne out, I believe, by an analysis of the legal history of the limitation of carriers' liability, as lucidly set forth in part I. of the majority opinion.

From 1906 until adoption of the Cummings Amendment [1], the clear public policy of Congress, as reflected in the Carmack Amendment,[2] was to prohibit absolutely any limitation on the liability of a carrier. The Cummings Amendment modified that public policy to allow limitation, but put the onus squarely on carriers who wanted to limit their liability by requiring them to file tariffs and then furnish bills of lading which complied with those tariffs. Thus, failure of a carrier's bill of lading to comply with the tariff as filed would foil such carrier's attempt to limit its liability.

As the law developed, a carrier desiring to meet the burden of compliance was required to present bills of lading which, at a minimum, provided notice to shippers by "red flagging" the limitation through highly visible printing in different type style and size, preferably set off by lines, boxes, indentation or the like, and by providing clearly identifiable blanks to be filled in by a shipper who was unwilling to abide by the carrier's limitation of its own liability. The purpose of the required treatment was to ensure that the shipper was put on notice of the limitation and of his right to vary from the carrier's proposed limitation, and at the same time to give the shipper adequate, designated space on the shipping documents in which to specify other rates. *See Hughes v. United Van Lines, Inc.*, 829

---

**1.** 49 U.S.C. § 10730 [Supp.1990].

**2.** 49 U.S.C. § 11707 [Supp.1990].

F.2d 1407 (7th Cir.1987), *cert. denied*, 485 U.S. 913, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988). Initially, no exceptions were permitted for failure strictly to comply; neither were exceptions carved out on the basis of the shippers' sophistication or the lack thereof.

The burden that carriers had to meet to limit their liability was eased somewhat with the jurisprudential advent of *substantial* as distinct from *strict* compliance with tariffs by bills of lading. But even then substantial compliance would suffice only if it were reasonable to conclude that, under the circumstances, the shipper had reasonable notice of the tariff provisions and an opportunity to choose a higher release rate. *See Hughes*, 829 F.2d at 1421; *Caspe v. Aacon Auto Transport, Inc.*, 658 F.2d 613, 615–16 (8th Cir.1981); *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103 (1st Cir.1978).

The move to substantial compliance was not, I believe, intended to eliminate the bright line test under Carmack and Cummings; it was at most meant to blur the edges a bit. But a full blown subjective test of the sophistication of the shipper's employee cannot help but result in the combined elements of sophistication and substantial compliance swallowing the objective yard stick intended by Congress. I cannot help but conclude that looking to the degree of sophistication possessed by the shipper, as done by the majority in this case, is the wrong approach for two reasons: First, each earlier case in which a court referred to sophistication of the shipper involved a unique or unusual fact situation rather than a "plain vanilla" submission of a printed bill of lading from a common carrier to a shipper, as in the instant case. Second, in those cases the courts' searches for sophistication were performed objectively, based on the nature of the shipper (experienced business establishment vis-a-vis naive homeowner), and not subjectively as to the particular employee who happened to participate in the shipment. It seems to me that the appropriate inquiry to make when testing a bill of lading for compliance with the carrier's posted or published tariff is: "Does the bill of lading give the *average, reasonable shipper,* under the same circumstances, (1) sufficient notice that the carrier intends to limit its liability, and (2) an opportunity to choose a higher release rate?"

With sincere deference to my colleagues of the majority, I still find the cases cited in the first paragraph of part *C. Sophistication,* in the majority opinion inapposite, principally because they do not deal with typical fact situations, such as the one under consideration in this case, when a carrier with a tariff on file submits its own preprinted bill of lading to a shipper. *Co-Operative Shippers, Inc. v. Atchison, T. & S.F. Co.,* 840 F.2d 447 (7th Cir.1988) did not involve tariffs and bills of lading. Rather, the plaintiff/shipper and defendant/carrier had negotiated a long-term, bulk contract for volume shipments. That agreement and related documentary evidence were construed objectively. The court merely noted in passing that the parties (not the individuals) were experienced and of equal commercial awareness, so that neither was entitled to any equitable consideration for *lack* of sophistication. *Hughes* involved the shipper of household goods. The shipper was not the usual, inexperienced homeowner, however, but a person who had moved numerous times over the previous years and was well acquainted with shipping practices. The case did not turn on the bill of lading's compliance with the tariff but on the fact that, despite the non-compliance, the shipper was found to have been put on notice of the carrier's limited liability because the carrier's agent had discussed the various limitation amounts with the wife. *See Hughes*, 829 F.2d at 1421. In that instance, the court held the husband, who happened to sign the bill of lading, to the same standard of notice as the wife and refused to disallow the limitation.

*Mechanical Technology, Inc. v. Ryder Truck Lines, Inc.,* 776 F.2d 1085 (2d Cir. 1985) involved a shipper that prepared its own bill of lading using the carrier's standard bill of lading as a guide. Moreover, the goods damaged in shipment were computers; the I.C.C. had issued special pre-

cautions for shipping such products, but none had been heeded by the shipper. Although the court mentioned that the parties were of equal economic stature and commercial acuity, sophistication or lack thereof was not a key element. And, like the other cases cited by the majority, this one did not involve the customary fact pattern of a carrier with a filed tariff presenting its own printed bill of lading which, on its face, neither strictly nor substantially complied with the tariff.

Following oral argument of the instant case to this panel, both counsel for both parties submitted letters pursuant to Rule 28(j), Federal Rules of Appellate Procedure, inviting this court to consider cases not previously cited. In one, *Norton v. Jim Phillips Horse Transp., Inc.*, 901 F.2d 821 (10th Cir.1989), the court found that the bill of lading substantially complied with the tariff. It is axiomatic that once there is a finding of either strict or substantial compliance, the carrier's liability is limited. All that the *Norton* court did was to underscore the equity of the limitation in that case by pointing out that the shipping of high priced horses is a specialized field, and that both shipper and carrier were experienced and of equal equine transportation acumen.

The two other Rule 28(j) cases submitted for our consideration, *Cincinnati Milacron, Ltd. v. M/V American Legend*, 784 F.2d 1161, *rev'd en banc*, 804 F.2d 837 (4th Cir.1986), and *Caterpillar Overseas, S.A. v. Marine Transport, Inc.*, 900 F.2d 714 (4th Cir.1990), involved shipments under the Carriage of Goods by Sea Act (COGSA).[3] *Cincinnati Milacron* is inapplicable because there the court was dealing with the issue of incorporation by reference in a "short form" bill of lading under COGSA. At most the court speculated in dictum about what the result might be if a COGSA shipper were *un*sophisticated. *Caterpillar Overseas* is another COGSA case not directly concerned with the Carmack/Cummings situation. In *Caterpillar Overseas*, there was no bill of lading whatsoever, but because the parties had dealt with each other in the past and were commercially experienced and of equal economic status, the court was willing to go so far as to find that the parties "intended" to use the carrier's standard bill of lading. *See Caterpillar Overseas*, 900 F.2d at 719–20. In fact, the shipper had already prepared a bill of lading of its own using the carrier's standard form to go by, but did not plan to have it signed until the goods were on board the vessel.

I find that (with the possible exception of a household goods situation in which the average reasonable homeowner is not expected to be sophisticated in the shipping industry) the cases involving sophistication or lack thereof have not considered that factor when determining whether, in an ordinary commercial transaction such as the one in the instant case, the bill of lading substantially complies with the tariff. As noted earlier, I infer that the majority opinion here would agree with the district judge and me that, *but for* the element of Mr. Burnett's subjectively high degree of sophistication, the bill of lading under consideration neither strictly nor substantially complies with the tariff. Until Congress sees fit to legislate an even more subjective double standard for unsophisticated and sophisticated shippers by providing something like "Truth in Shipping" regulations for the former category, I believe we are making a mistake to test compliance of bills of lading on the basis of that trait, particularly if we do so subjectively as to the particular individual involved in signing the shipping papers.

I cannot avoid the conclusion that, by permitting the carrier that furnishes a bill of lading, which on its face neither strictly nor substantially complies with the tariff, to have it subjectively converted to one that does substantially comply solely because it has been submitted to a sophisticated employee of the shipper, we emasculate the intentionally objective, restrictive law of limitation of liability that Congress sought to impose on carriers. Under today's majority opinion, instead of continuing to proscribe a carrier's limitation of

---

**3.** 46 U.S.C.App. §§ 1300–1315 (1982).

its own liability unless its bill of lading gives notice to the shipper and a reasonable opportunity for the shipper to choose a higher released rate through strict or substantial compliance with its tariffs, we move to a highly subjective, fact intensive, case by case determination every time there is a loss of or damage to goods in shipment. Doing that impresses me as a frustration of the Congressional policy embodied in the applicable statutes—one almost certain to foment litigation, destroy predictability and stability, and ultimately increase the cost of transporting goods.