**Victoria E. BANOS**

v.

**ECKERD CORP., and RPS, Inc.**

**No. CIV. A. 96–4089.**

United States District Court, E.D. Louisiana.

March 11, 1998.

---

Robert Stephen Toale, Gretna, LA, for Victoria Banos.

James Johnston Morse, Jr., New Orleans, LA, for Eckerd Corp.

Michele Whitesell Crosby, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP, Baton Rouge, LA, Law Offices of George W. Wright, Hackensack, NJ, for RPX Inc. of Delaware.

## ORDER AND REASONS

LIVAUDAIS, District Judge.

Defendant RPS, Inc., has filed a motion for partial summary judgment, seeking dismissal of plaintiff's complaint against it or, alternatively, limiting RPS's liability to Banos to $ 100.00, and against Eckerd Corp., co-defendant in the main demand and cross-defendant, limiting its liability to Eckerd to $ 100.00. Eckerd has filed a detailed opposition memorandum to the motion, which plaintiff has adopted.

Defendant Eckerd owns and operates a multi-state chain of drug stores. In many of the drug stores, Eckerd operates Eckerd Express Photo Labs. For certain orders, the store provided one hour photo processing on the premises, but other jobs were sent to other locations for processing. On December 13, 1995, plaintiff Victoria Banos decided to order a personalized computer screen saver for her father for Christmas through a promotion marketed by Eckerd. She placed the order with Tanya Larson, an Eckerd Photo Lab Manager, at the Eckerd Express Photo Lab in the Eckerd drug store located at 3535 Severn Avenue, Metairie, Louisiana. In connection with this order, Banos provided 28 old, original family photographs, many of which had no negatives, to be used to create the computer screen saver.

In order to create a personalized computer screen saver, the customer's personal photographs would be processed at an Eckerd facility in Clearwater, Florida. The Eckerd photo lab used defendant RPS to ship the photographs provided by the customers who placed screen saver orders to the Clearwater location.

Eckerd had previously entered into a "Service Agreement" with RPS for the transportation of small packages. On April 28, 1994, Eckerd Express Photo Lab in Austin, Texas, entered into this Service Agreement, which governed the relationship pursuant to which shipping services were provided to many of the Eckerd Express Photo Labs, including the Severn Avenue store in Metairie. The 15-page Invoice Summary for the week ending December 15, 1994 reflects centralized billing of numerous Eckerd accounts, and the shipments made by each were all billed to the Eckerd corporate offices at 8333 Bryan Dairy Road in Largo, Florida.

Eckerd used RPS to ship not only small packages containing film, negatives, and photographs to other locations for processing in connection with the photo labs it operated in its stores, but also used RPS to ship large, heavy silver cartridges, resembling helium

tanks in shape, to the manufacturer for recycling or for environmentally-appropriate disposal. These cartridges are used for in-house photo processing, and on the average, one or two silver cartridges are shipped back to the manufacturer per month.

The Service Agreement entered into by shipper Eckerd and carrier RPS states the terms and conditions of the arrangement. The Service Agreement provides in pertinent part that:

1. RPS agrees to transport packages tendered by the Shipper between the ZIP code pairings listed in RPS tariff ICC RPSI 100 and to provide such transportation and related accessorial services in accordance with RPS tariff ICC RPSI 200....

2. Shipper agrees to the rules and provisions set forth in RPS tariff ICC RPSI 200 and to the Terms and Conditions of Transport stated on the RPS Pick–Up Record....

4. Shipper agrees to pay RPS the base rates and accessorial or other charges published in the RPS Rate Schedule, as modified by the latest addendum(s) to this Service Agreement.

5. If authorized by RPS to ship packages "collect", Shipper agrees to pay to RPS the weekly charge for Pick-up Service, and any charges for Acknowledgment of Delivery, C.O.D. Service, Address Corrections, and Declared Value in excess of $ 100.00 per package in accordance with RPS tariff ICC RPSI 200.

7. If authorized by RPS to participate in the Return–to–Vendor Program, Shipper agrees not to file claims for loss or damage resulting from the transportation services provided by RPS in connection with the Return–to–Vendor Program.

Attachment 2 to Eckerd's Memorandum in Opposition.

RPS is an interstate common carrier of merchandise specializing in the transportation of small packages. Prior to January 1, 1996, in accordance with federal statutes and regulations, RPS filed with the Interstate Commerce Commission (ICC) a tariff setting forth its freight rates and limitations of liability. This tariff is referred to as Tariff ICC RPSI 200–G, effective February 6, 1995, filed by RPS with ICC. Tariff 200–G states that RPS shall assess its freight charge on a package depending on whether the consignor-shipper declares a value not exceeding or exceeding $100.00 per package. The shipper must pay, in addition to the base rate, a $ .35 per package charge for each $100.00 of additional declared valuation on the goods shipped.

In connection with its shipping services, RPS had two forms to be completed by shippers who used its services, here specifically Eckerd. One was an "RPS Pick–Up Record", and it contains a space entitled "Declared Value per package", and also contains the statement on the front, and on the back in bold letters that RPS's liability is limited to $ 100.00 per package unless a higher value is declared by the shipper and an additional charge is paid at the rate stated in the Tariff. Exhibit D to RPS's Reply Memorandum. The "Vendor Returns Pick–Up Record", which apparently was specifically designed to return the cartridges to the manufacturer, also contains a space entitled "Declared Value", but does not contain the statement that liability is limited to $100.00 per package unless a higher value is declared and an additional charge is paid. RPS does have a customer service guide, which provides copies and explanations of its forms, guidelines for Cash on Delivery, Acknowledgment on Delivery, Proof of Delivery, package preparation, restrictions and liabilities, and specifically RPS's standard liability and Declared Value.

When Eckerd Photo Lab Manager Tanya Larson took Banos' order, she filled out a Vendor Returns Form, which to her knowledge was the only form and the only type of receipt book provided by RPS for any type of package. The Vendor Return Form ("Vendor Returns Pick–Up Record") are pre-printed and contained in a bound booklet of 25 to 50 forms each. Each form is sequentially numbered and there are three carbon-type copies of each numbered receipt. Only the

top two sheets were used, the first being marked "original" and the second identified as "Shipper Rep Copy". The reverse side was blank, but the front does contain a space for "Declared Value". Each could be used for multiple packages.

Eckerd Photo Lab manager Larson filled out the Vendor Return Form No. 637382 for Banos' package containing photographs as well as for another customer's screen saver order package also containing photographs. She would customarily use this same form to return silver cartridges to the manufacturer as well as to send all packages in connection with photo processing. Larson stated she was unaware of any limitation of liability and was never provided with any other forms for shipments.

RPS picked up the two packages containing Banos' photographs as well as another package containing photographs for a screen saver, both designated for shipment to Clearwater, Florida.[1] Eckerd paid the base freight rate of $2.85 for the Zone 4 transportation (Louisiana to Florida) of the Banos package weighing one pound, with no additional charge for declaration of value in excess of $ 100.00. None of the packages in question containing photographs for screen savers were ever delivered to their destination in Clearwater, Florida. The Banos photographs have vanished and there is no indication from RPS what happened to them. The photographs that were sent in a separate package from a customer named Fowler were returned to the Eckerd store. Some of those photographs were damaged and appeared smoky, as if they had been in a fire.

Eckerd filed a Loss and Damage Claim, dated April 12, 1996, with RPS, claiming $ 28,000 for the loss of the Banos photographs, which were contained in RPS Package No. 4662672, and recorded in RPS Pick-Up Record No. 637382. RPS's position is that its liability with respect to this package is $ 100.00, since there was no declared value in excess of $ 100.00 on the pick-up record.

The liability of a carrier for damage to an interstate shipment is controlled by the Interstate Commerce Act. The Carmack Amendment to the Interstate Commerce Act ("ICA") imposes liability on carriers for actual loss, damage, or injury to property they transport, and declares unlawful and void any contract, regulation, tariff, or other attempted means of limiting its liability. The effect of the Carmack Amendment to the ICA is that a carrier is liable for damage to the goods it transports unless it can demonstrate that the damage was caused by "(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." *Missouri Pacific Railroad Co. v. Elmore & Stahl,* 377 U.S. 134, 136, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964). The shipper is entitled to recover for from the initial carrier for the full damages sustained, "notwithstanding any limitation of liability in the receipt or bill of lading, with the exception, important here, that where a carrier by authority or direction of the Interstate Commerce Commission maintains rates dependent upon the value of the property declared in writing by the shipper, such declaration also limits liability of the carrier for loss or damage to an amount not in excess of the declared value." *Peyton v. Railway Express Agency,* 316 U.S. 350, 351, 62 S.Ct. 1171, 1172, 86 L.Ed. 1525 (1942).

The liability of a common carrier of goods in interstate commerce is preempted by the provisions of the Carmack Amendment to the ICA. As described by the Fifth Circuit in *Air Products and Chemicals, Inc. v. Illinois Central Railroad Co.,* 721 F.2d 483 (5th Cir.1983):

Despite the apparent statutory limitation to recovery of damage caused to the property itself transported, the Supreme Court ... from its earliest interpretation has consistently construed [the Carmack Amendment] as likewise imposing liability upon the carrier for all reasonably foreseeable consequential damages resulting from a breach of the contract of carriage, includ-

---

**1.** While Banos deposited two packages containing photographs with Eckerd, only one package is at issue in this lawsuit.

ing those resulting from nondelivery of the shipped goods as provided by the bill of lading. [citations omitted] 'The words 'any loss, damage, or injury to such property' . . . are comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination.' *New York, Philadelphia & Norfolk Railroad Company v. Peninsula Produce Exchange of Maryland,* 240 U.S. 34, 38, 36 S.Ct. 230, 232, 60 L.Ed. 511 (1916). . . .

This broad interpretation of a carrier's liability under its bills of lading was premised upon what the Court conceived to be a paramount object of the legislation—to provide a uniform rule that the carrier issuing the bill of lading would be responsible to the consignee for all loss, damage, or delay arising out of the contract to transport the goods so shipped. [citations omitted]. Moreover, a purpose was to substitute a paramount and uniform national law as to the rights and liabilities of interstate carriers subject to the Amendment.

721 F.2d at 485–486. Thus, a common carrier's liability under the Carmack Amendment cannot be enlarged or restricted by contract or by tort.

After the adoption of the Carmack Amendment, shippers began to charge exorbitant rates for shipments insured at full value. In reaction, Congress enacted the Cummings Amendment (at all times relevant to this motion, 49 U.S.C. § 10730), which allowed carriers to limit their liability, but granting authority to the ICC to approve rates through tariffs. *Rohner Gehrig Co., Inc. v. Tri–State Motor Transit,* 923 F.2d 1118, 1119–1120 (5th Cir.1991), *rehearing en banc granted,* 950 F.2d 1079 (5th Cir.1992). The Fifth Circuit explained the operation of a limitation of liability clause in a tariff by an interstate carrier in this manner:

A tariff is a document filed by the carrier and published by the ICC listing several freight rates available to shippers for different types of equipment. The tariff is not part of the bill of lading given to the shipper, but rather a separately published

document incorporated by reference into the bill of lading.

Each rate in a tariff carries a corresponding level of liability per pound which is terms a 'released rate.' A higher freight rate, therefore, secures a higher level of liability. When a tariff contains an inadvertence clause and a shipper fails to declare a value in the bill of lading, then the shipper is insured at the lowest rate permitted in the tariff. The inadvertence clause is usually incorporated into the bill of lading in the released rate clause by a sentence which states that if the shipper fails to state a released rate, the shipment is deemed released at the lowest rate or the rate listed. The shipper, therefore, is not compelled to accept the given released rate but may instead choose a higher rate by incorporating it into the bill of lading.

923 F.2d at 1120.

■ For a carrier to reap the benefits of the limitation of liability in a bill of lading, it must:

1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; 2) obtain the shipper's agreement as to his choice of liability; 3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and 4) issue a receipt or bill of lading prior to moving the shipment.

*Rohner Gehrig Co.,* 923 F.2d at 1121, *quoting Hughes v. United Van Lines, Inc.,* 829 F.2d 1407, 1415 (7th Cir.1987), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988). *Accord, Rohner Gehrig,* 950 F.2d at 1083.

■ In the circumstances presented here, there is no dispute that RPS maintained a tariff with the ICC and that it issued a receipt or bill of lading, i.e, the Vendor Return Form, to the shipper, Eckerd. The question is whether it obtained Eckerd's agreement as to its choice of liability and whether it provided Eckerd with a reasonable opportunity to choose the level of liability. Eckerd and RPS signed an agreement regarding the applicable tariffs, including the limitation of liability and declared value provisions. A bill of lading which substantially

complies with the related tariffs may support limitation of the carrier's liability to the same extent as if each bill of lading issued strictly complied with the tariff. 950 F.2d at 1083.

The Fifth Circuit examined the bill of lading at issue in *Rohner Gehrig*, which involved a single shipment of goods pursuant to a bill of lading, and found it "woefully lacking". The court noted that the inadvertence clause was not printed in boldface type, was not set off in an enclosed block or box, was not printed in a distinctively large or small type size, and was not located in a conspicuous place on the form. The court observed that "more importantly, [the bill of lading] contained no box, block, or other space in which the shipper might insert a different declared or released valuation, alternate rate, signature, date, or other information to substantiate a shipper's choice of a different release rate." 950 F.2d at 1084. In determining that the bill of lading did not substantially comply with the posted and published tariffs, the *Rohner Gehrig* court cautioned that "[w]ere this simply a case of interpreting a bilateral agreement signed by duly authorized agents of the contracting parties, we might well find the provisions of the B.O.L. sufficient to limit the liability of the carrier." 950 F.2d at 1083.

In the instant case, RPS contends that the claim of Banos, plaintiff in this action, must be dismissed because she was not a party to the shipping agreement and, inasmuch as a common carrier's liability is limited to that prescribed in the Carmack Amendment, any tort claims of the plaintiff against it must be dismissed. However, consignors, holders of the bills of lading issued by the carrier, and persons beneficially interested in the shipment although not in possession of the actual bill of lading, in addition to shippers, have standing to sue under the Carmack Amendment. *Harrah v. Minnesota Mining and Manufacturing Co.*, 809 F.Supp. 313, 318 (D.N.J.1992), citing *St. Louis S.F.R. Co. v. Ozark White Lime Co.*, 177 Ark. 1018, 9 S.W.2d 17 (1928) (Consignors may proceed against carriers under the Act). *Black's Law Dictionary* (West 1979), defines a consignor as "[o]ne who sends or makes a consignment; a shipper of goods. The person named in a bill of lading as the person from whom the goods have been received for shipment." Under this definition, Banos is a consignor and thus may recover under the Carmack Amendment for damage or loss to the goods she gave to Eckerd, the shipper, for shipment by RPS.

Neither Eckerd nor plaintiff contest RPS's contention that all of the rights and liabilities of the parties *vis-a-vis* RPS are governed by the Carmack Amendment. Eckerd argues that RPS' motion for summary judgment should be denied because there are material issues of fact in dispute relating to whether RPS is a common carrier or contract carrier. However, the Service Agreement between Eckerd and RPS governs the shipment in this matter and the Carmack Amendment is therefore applicable. Whether RPS is a common carrier or a contract carrier is not material to the question of limitation of liability provisions under the Carmack Amendment.

Eckerd suggests that the Vendor Return Form, which was used by Eckerd personnel as the receipt for shipment, did not comply with the factors listed by the *Rohner Gehrig* court as required before the carrier may enforce its limitation of liability clause, specifically whether it afforded Eckerd, as shipper, a reasonable opportunity to choose between one or more levels of liability. If this suit did not involve transportation of goods deposited by Eckerd for shipment by RPS pursuant to a Service Agreement, it appears somewhat doubtful that the Vendor Return Form, if it were used as a bill of lading, prepared by RPS and provided by it to Eckerd would substantially comply with the *Rohner Gehrig* requirements. However, a bill of lading is defined as a "[d]ocument evidencing receipt of goods for shipment issued by person engaged in business of transporting or forwarding goods and it includes airbill... An instrument in writing, signed by a carrier or his agent, describing the freight so as to identify it, stating the name of the consignor, the terms of the contract for carriage, and agreeing or directing that the freight be delivered to the order or assigns of a specified person at a specified place. It is receipt for goods, contract for their carriage, and is

documentary evidence of title to goods." *Black's Law Dictionary* (West 1979).

In the case *sub judice,* the Vendor Return Form operated as a receipt for goods, but clearly was not the contract for their carriage and did not specify the terms of the contract. Eckerd and RPS had a Service Agreement listing all of the relevant terms of the contract, and it incorporated the tariff and the Pick–Up Form, which did include conspicuously and on the front, and in bold on the reverse, the limitation of liability provision. Even so, the Vendor Return Form, which should have been used by Eckerd employees only for the cartridges being returned to the manufacturer and as to which Eckerd agreed to make no claims for damage, contained a space for declared value. As between Eckerd and RPS, the Service Agreement substantially complied with the tariff filed by RPS, as it incorporated it by reference. A receipt was issued for the goods to Eckerd, and Eckerd had a reasonable opportunity to select a higher declared value. The fact that it did not properly instruct its employees as to the correct use of the forms is not material as to the liability of RPS under the Carmack Amendment, as Eckerd itself was party to the Service Agreement, which incorporated the tariff itself.

Plaintiff Banos stands in the shoes of Eckerd insofar as RPS's liability for the shipment is concerned. However, Banos may have additional rights against Eckerd, which are not the subject of this motion.

Accordingly, for the above and foregoing reasons,

**IT IS ORDERED** that the motion of RPS, Inc., for partial summary judgment on the claims of plaintiff, Victoria E. Banos, and the cross-claims of defendant/cross-claimant Eckerd Corp., be and is hereby **GRANTED IN PART** and its liability is limited to $100.00 per package for the loss of RPS Package No. 4662672.